1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11  HEATHER MARIE EWING; MARK LEE
    EWING; KATELYN JOYNER EWING-
12  MUNNERLYN, a minor by and
    through her father MARK LEE
13  EWING; RACHEL MARIE EWING, a
    minor by and through her
14  parents HEATHER MARIE EWING
    and MARK LEE EWING; and
15  SAVANNAH JAILYN EWING, a minor
    by and through her parents
16  HEATHER MARIE EWING and MARK
    LEE EWING,
17                                      NO. CIV. S-05-2270 WBS GGH
            Plaintiffs,
18
        v.                             MEMORANDUM AND ORDER RE:
19                                     MOTIONS FOR SUMMARY JUDGMENT

20  CITY OF STOCKTON; DISTRICT
    ATTORNEY JOHN D. PHILLIPS;
21  DEPUTY DISTRICT ATTORNEY
    LESTER F. FLEMING; OFFICER
22  WILLIAM JEROME HUTTO,
    individually and in his
23  capacity as a City of Stockton
    Police Officer; OFFICER STEVEN
24  McCARTHY, individually and in
    his capacity as a City of
25  Stockton Police Officer;
    OFFICER JOHN J. REYES,
26  individually and in his
    capacity as a City of Stockton
27  Police Officer,

28              Defendants.

                             1

----oo0oo----

Plaintiffs Heather Marie Ewing, Mark Lee Ewing, Kaetlyn Joyner Ewing-Munnerlyn, Rachel Marie Ewing, and Savannah Jailyn Ewing ("plaintiffs") filed their Second Amended Complaint in this lawsuit pursuant to 42 U.S.C. § 1983, alleging that defendants City of Stockton, John D. Phillips, Lester F. Fleming, William Jerome Hutto, Steven McCarthy, and John J. Reyes violated their constitutional rights throughout a series of events culminating in the arrest of Mark and Heather Ewing on murder charges. Defendants City of Stockton and police officers Hutto, McCarthy, and Reyes now move for summary judgment.  In a separate motion, defendants Fleming and Phillips also move for summary judgment.

I.   <u>Factual and Procedural Background</u>

A.   <u>The Donahue Murder</u>

On November 5, 2004, an altercation took place outside Shakers' Bar in Stockton, California between a group of men at the bar and two other male patrons wearing vests identifying themselves as members of the Jus' Brothers Motorcycle Club[1] (hereinafter, the two men are referred to as the "Jus' Brothers members").  (Pls.' Stmt. of Disputed Facts # 1.)[2]  Though not initially involved in the fight, a young man named Mark Donahue

---

[1]   According to its website, "[t]he JUS BROTHERS Motorcycle Club is a serious 3-piece patch club with a membership dedicated to Brotherhood and riding Harley's.  We ARE a legitimate motorcycle club whose purpose is to promote and share our interest in riding motorcycles."  Jus Brothers Motorcycle Club, http://www.jusbrothersmc.com/ (last visited Jan. 16, 2008).

[2]   In an apparent effort to reinforce their position opposing summary judgment, plaintiffs label their entire recitation of facts as "disputed" even though they make no effort to say how or why there is a dispute.

2

and several friends arrived at the scene and stood nearby to watch the altercation. (Tr. of Interview with Shirk 2:1-4.) They purportedly observed one Jus' Brothers member swinging a crescent wrench at his adversaries, while the other member similarly swung what appeared to be a large, three cell Mag-Lite flashlight. (<u>Id.</u> at 2:10-17.)

During the melee, a female companion of the two Jus' Brothers members made contact with Donahue while seemingly attempting to distance herself from the fracas. (<u>Id.</u> at 3:1-4.) After the initial contact, the female companion purportedly shoved Donahue, leading him to turn around and yell at her. (<u>Id.</u> at 3:6-7.) She responded by calling out for the Jus' Brothers member who had been wielding the flashlight, and he subsequently came over and engaged Donahue in a fight by hitting him over the head with the flashlight. (<u>Id.</u> at 3:11-12.) Over the next several moments, Donahue and the Jus' Brothers member continued to brawl--ending up on the ground, where the Jus' Brother member brandished a knife and stabbed Donahue. (Pls.' Stmt. of Disputed Facts # 3.) The Jus' Brother member then stood up and immediately mounted a motorcycle, and the female companion who had initially made contact with Donahue climbed onto the back of this motorcycle. (<u>Id.</u> # 4.) The second Jus' Brother member also pulled away from the altercation and mounted a separate motorcycle, and all three quickly left the scene before police officers arrived. (<u>Id.</u>)

Donahue was immediately taken to the hospital, where he was pronounced dead as a result of the stab wound. (Pls.' Stmt. of Disputed Facts # 3.) Shortly thereafter, defendants Detective

3

1 Reyes (assigned by defendant Sergeant McCarthy as lead

2 investigator in the incident) and Detective Hutto (assigned by

3 McCarthy to assist Reyes) of the Stockton Police Department

4 (SPD), along with several patrol officers, arrived at the scene

5 and took statements from twenty-one witnesses describing the

6 altercation as well as providing details as to the appearance of

7 the two Jus' Brothers members and their female companion.

8 (Defs.' Stmt. of Undisputed Facts # 3-9.)

9          B.    The Identification of Heather Ewing as a Suspect and

10               Procurement of a Search Warrant

11          On November 6, the day after the incident, defendant

12 Reyes was contacted by Brian Shirk, one of the witnesses who had

13 previously given a statement at the scene.  (Tr. of Interview

14 with Shirk 1:7-9.)  Shirk, who had arrived at Shakers' Bar with

15 Donahue's group and was standing next to Donahue as the Jus'

16 Brothers member attacked him, told Reyes that he had gone on the

17 Jus' Brothers website and found two pictures containing the

18 female companion who was at the bar the previous night.  (Id. at

19 20:2-9.)  Shirk subsequently came to the police investigations

20 center at the Stewart Eberhardt Building (SEB) the following day

21 (November 7) for a videotaped interview with Reyes  (Pls.' Stmt.

22 of Disputed Facts # 19.)  Shirk repeated his statement to Reyes

23 that the woman in the pictures taken from the Jus' Brothers

24 website was same woman who had called over the Jus' Brothers

25 member who stabbed Donahue.  (Tr. of Interview with Shirk

26 20:8-14.)

27          Based on the information conveyed to him by Shirk

28 regarding the pictures from the Jus' Brothers website, Reyes met

4

with District Attorney Investigator David Betocchini.[3]   (Pls.'
Stmt. of Disputed Facts # 27.)   Bertochinni--whose previous
information-gathering activities as part of the District
Attorney's Street Gangs Unit had equipped him with significant
background knowledge related to the Jus' Brothers Motorcycle
Club--looked at the pictures and immediately identified the woman
as Heather Ewing, wife of Jus' Brothers member and vice president
Mark Ewing.   (Defs.' Stmt. of Undisputed Facts # 11.)

After attaining copies of both Mark and Heather Ewing's
DMV photographs from Bertocchini, Reyes met with McCarthy and
Hutto to prepare a search warrant for the Ewing residence.
(Pls.' Stmt. of Disputed Facts # 27-28.)   Reyes and Hutto then
conducted a records search to determine whether "Heather Marie
Ewing" had any prior criminal history, but both of their searches
came up negative.   (Id. # 36.)   Reyes, who had agreed to write
the portion of the search warrant dealing with Shirk's purported
identification of Heather Ewing, also ran a stand-alone search of
the name "Ewing" that turned up a prior criminal arrest for one
"Nicolette Marie Ewing."   (Id. # 39.)   Though a professed
computer malfunction left him unable to secure a photo of
"Nicolette Marie Ewing"--which he presumably could have compared
with his DMV photo of "Heather Marie Ewing" to determine whether
or not they were indeed the same person--Reyes nonetheless
included the information in the warrant.   (Alonso Decl. Ex. K
("Search Warrant") Ex. B.)   However, he did not mention that the

---

[3]     Bertocchini was originally named as a defendant in the
instant action, but the parties later stipulated to dismiss him,
with prejudice, pursuant to Rule 41(a)(1) of the Federal Rules of
Civil Procedure.   (Nov. 8, 2007 Order.)

violation was found under "Nicolette Marie Ewing," but instead opted to include only a short disclaimer. (Id. Ex. B 13:8-12) ("I was not able to retrieve the photograph, as the equipment was not functioning properly.").)

On the evening of November 7, 2004, Reyes and Hutto presented their search warrant to Superior Court Judge Bob McNatt, who subsequently signed the search warrant. (Pls.' Stmt. of Disputed Facts # 59.)

C.   Execution of Search Warrant and the Initial Arrest of Mark and Heather Ewing

On the morning of November 8, members of the SPD gathered at the home of Mark and Heather Ewing, located at 405 South Carroll Avenue in Stockton, California. (Defs.' Stmt. of Undisputed Facts # 17.) At 6:30 a.m., just thirty minutes before the time at which the SPD could serve the warrant, officers observed Mark Ewing leaving the residence in one of the vehicles (a Chevrolet truck) listed in the search warrant. (Id. # 18.) Detective Steven Capps left the residence to follow Mark Ewing's vehicle, notifying Detective Todd Kamigaki[4] (who was en route to the Ewing residence) and several other patrolmen in the area to stop the vehicle. (Id. # 19.) After the patrol officers spotted Mark Ewing at a neighboring gas station, they conducted a high-risk stop[5] at approximately 6:55 a.m. (Id. # 20.) Shortly

_____

[4]   Both Capps and Kamigaki were initially listed as defendants in the instant action, but the parties stipulated to dismiss them with prejudice. (Nov. 9, 2007 Order).

[5]   It is SPD protocol to conduct a high-risk stop of vehicles involved in homicide investigations. (Kamigaki Dep. 24:4-8.)

thereafter, Detective Capps arrived at the gas station. (Id. # 21.)  Mark Ewing was detained while Detective Capps searched the vehicle, retrieving two cellular phones. (Id. #21.)  Mark Ewing was subsequently transported to the SEB. (Id. # 22.)

Meanwhile, back at the Ewing residence, the SPD's Special Weapons and Tactics (SWAT) Team[6] entered the house at 7:00 a.m.[7] to serve the search warrant. (Alonso Decl. Ex. EE (Kamigaki Incident Report 1).)[8]  After serving the warrant, collecting Heather Ewing and her daughters, and securing the house, the SWAT Team gave way to SPD detectives including Reyes and Hutto. (Id.)  The detectives' ensuing search revealed evidence including marijuana plants, a blue steel Ruger (handgun), a motorcycle, a blue Mag-Lite flashlight found inside one of the motorcycle compartments, and indicia of the Jus' Brothers Motorcycle Club. (Defs.' Stmt. of Undisputed Facts # 23.)  Subsequently, Heather Ewing was also taken to the SEB, where she was finger-printed and photographed. (Pls.' Stmt. of Disputed Facts # 72.)

---

[6]   It is SPD protocol to allow the SWAT Team to execute all search warrants that involve homicide investigations unless express permission is given by the SPD division commander. (Peppard Dep. 44:2-6.)

[7]   Plaintiffs had originally contended that the SWAT Team illegally entered the residence prior to 7:00 a.m.  However, plaintiffs have not brought forth any evidence in support of this argument, and it is thereby relinquished.

[8]   While defendants make several overbroad evidentiary objections to plaintiffs' reliance on police incident reports, it is well settled that personal observations of officers contained in their police reports are generally admissible.  Colvin v. United States, 479 F.2d 998, 1003 (9th Cir. 1973).  Thus, the court will properly consider such evidence.

1    Later that day at the SEB, Mark and Heather Ewing were
2    separately interrogated by Reyes and Hutto, and then Reyes
3    arrested both of them on gun[9] and drug-related charges stemming
4    from the materials found in their residence during the search.[10]
5    (Id. # 73.)

6         D.   Arrests for Murder and Subsequent Dismissal of Charges

7              During the afternoon of November 8 (shortly after
8    arresting Mark and Heather Ewing on the gun and drug-related
9    charges), Reyes showed two separate six-pack photo lineups--one
10   containing Heather Ewing and the other containing Mark Ewing--to
11   five key witnesses from the November 5 incident at Shaker's Bar.
12   (Defs.' Stmt. of Undisputed Facts # 26-27.)  Between the five key
13   witnesses, three unequivocally identified Heather Ewing in the
14   photo lineup as the female companion who called over to the Jus'
15   Brothers member during the altercation.  (Id. # 26).  However,
16   only one out of the five witnesses was able to "tentatively"
17   identify Mark Ewing as being present at the incident.  (Id. # 27;
18   Reyes Dep. 340:7-10 (describing the identification of Mark Ewing
19   as a "50-60% ID").)

20             Following the common practice of the SPD, Reyes
21   contacted Deputy District Attorney Lester Fleming regarding a
22   decision whether or not to arrest Mark and Heather Ewing for the

23

24   _____

25   [9]   Prior to conducting the search, the officer defendants
     knew that Mark Ewing was not allowed to possess firearms as a
26   result of a prior felony conviction.  (Fleming Dep. 26:10-13.)

27   [10]   Both Mark and Heather Ewing were arrested for
     violations of California Health and Safety Code sections 11358,
     11370.1(a), and 11357(c) and Penal Code sections 12022(a)(1) and
28   273a.  (Hutto Dep. 252:9-24.)

8

1  Donahue murder.[11]   (Reyes Dep. 189:22-24.)   During their

2  meeting, Reyes relayed all the evidence compiled to

3  date--including the fruits of the SPD's search as well as the

4  results from the photo lineups.  (Id. at 196-97.)  Reyes also

5  purportedly told Fleming that he was concerned that there was a

6  lack of evidence to make an additional arrest on murder charges.

7  (Id. at 198-99.)  However, Fleming then told Reyes that he was

8  going to file a criminal complaint charging Mark and Heather

9  Ewing with murder, and thereby instructed Reyes to add charges of

10 murder ("add-book") against them.  (Id. 196:9-10.)  Thus, on

11 November 8, Reyes add-booked murder charges against Mark and

12 Heather Ewing.  (Pls.' Stmt. of Disputed Facts # 79.)

13         Between the time that Reyes add-booked the murder

14 counts and Fleming's subsequently filing of the criminal

15 complaint charging the Ewings with murder (November 10),

16 questions arose as to whether the SPD had arrested the right

17 people.  (Hutto Dep. 290-91.)  Specifically, on November 9, a key

18 witness returned to the SEB, looked at a group picture of the

19 Jus' Brothers Motorcycle Club, and identified a man in the

20 picture--later in the day confirmed to be Robert Memory--as one

21 of the Jus' Brothers members present at Shakers' Bar during the

22 November 5 incident.  (Id. at 288:2-14.)  Not only was this man

23 not Mark Ewing, but the witness volunteered to police that she

24 had seen the mug shot of Mark Ewing in the newspaper and, in her

25 recollection, Mark Ewing was definitely not present at the bar

26 _____

27        [11]   There is some contention whether meeting with the
   District Attorney is the "policy" of the SPD or simply a "common
   practice."  However, this dispute has no bearing on the scope of
28 this motion.

that night (i.e., was not the second Jus' Brothers member, either). (Id.) Further, on the morning of November 10, Reyes and Hutto were informed of two anonymous calls telling the SPD that they had the wrong people, and instead the responsible party was a man named "Frankie." (Id. at 290-91.)

Equipped with this information, Reyes and Hutto met with Fleming and Deputy District Attorney Royce Mayo during the afternoon on November 10 to discuss the status of the case. (Reyes Dep. 361:11-19.) Reyes renewed his concerns related to the murder charges, especially in light of the information gathered since his first meeting with Fleming on November 8. (Id. at 363:15-19.) Notwithstanding the recent information, however, Fleming proceeded to file the criminal complaint charging Mark and Heather Ewing with murder. (Pls.' Stmt. of Disputed Facts # 87.)

Shortly thereafter, a lawyer contacted the SPD indicating that he represented a Jus' Brothers member named Frankie Prater who was involved in the November 5 incident and was willing to turn himself in.[12] (Reyes Dep. 368:1-3.) On November 11, multiple witnesses identified both Robert Memory and Frankie Prater as the two Jus' Brothers members involved in the incident; witnesses also identified Teresa Prater, wife of Frankie Prater, as the female companion present at the scene.

---

[12] After their meeting with Fleming and Mayo, Reyes and Hutto also learned that "Frankie" was Jus' Brothers member Frankie Prater when Prater's business partner--who happened to have a cousin at the SPD--notified his cousin that Frankie Prater had not come into work all week. (Pls.' Stmt. of Disputed Facts # 86.) The business partner subsequently spoke with Frankie, who mentioned his involvement in the November 5 incident. (Id.)

(Pls.' Stmt. of Disputed Facts # 88-89.)  Based on the

identifications, Hutto obtained arrest warrants for Robert Memory

and Frankie Prater.  (Id. # 88.)  On November, 12, Memory and

Prater turned themselves in on the warrants (id. # 90), and on

November 15, the murder charges were dropped against Mark and

Heather Ewing.[13]  (Id. # 91.)

On March 6, 2007, plaintiffs filed their Second Amended

Complaint alleging multiple violations of 42 U.S.C. § 1983.

(Second Am. Compl. ¶¶ 20-28 ("SAC").)  Specifically, plaintiffs

allege that defendants Hutto, McCarthy, and Reyes (the "officer

defendants") and defendant City of Stockton violated plaintiffs'

constitutional rights by (1) procuring an invalid search warrant;

(2) not complying with the knock-and-announce rule when serving

the search warrant; (3) exercising excessive use of force during

service of the search warrant; (4) arresting Mark and Heather

Ewing on gun and drug charges without probable cause; (5)

arresting Mark and Heather Ewing on murder charges without

probable cause; and (6) keeping Mark and Heather Ewing in jail

after learning the identity of the real participants in the

murder.  Plaintiffs also join defendants Fleming and Phillips as

to the arrest of Mark and Heather Ewing on murder charges.  In

addition, plaintiffs allege state law claims of negligence

(against all defendants) and negligent supervision (against

defendants City of Stockton and Phillips).

On November 16, 2007, the officer defendants and

---

[13]    The gun and drug charges remained, and Mark Ewing
subsequently pled no contest to a violation of California Health
and Safety Code section 11257(c) (possession of marijuana, less
than one ounce).  (Defs.' Stmt. of Undisputed Facts # 34.)

1  defendant City of Stockton filed a motion for summary judgment
2  or, in the alternative, summary adjudication.  In a separate
3  motion filed on the same day, defendants Fleming and Phillips
4  also moved for summary judgment or, in the alternative, summary
5  adjudication.

6  II.  Discussion

7      Summary judgment is proper "if the pleadings,
8  depositions, answers to interrogatories, and admissions on file,
9  together with the affidavits, if any, show that there is no
10 genuine issue as to any material fact and that the moving party
11 is entitled to judgment as a matter of law."  Fed. R. Civ. P.
12 56(c).  A material fact is one that could affect the outcome of
13 the suit, and a genuine issue is one that could permit a
14 reasonable jury to enter a verdict in the non-moving party's
15 favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
16 (1986).  The party moving for summary judgment bears the initial
17 burden of establishing the absence of a genuine issue of material
18 fact and can satisfy this burden by presenting evidence that
19 negates an essential element of the non-moving party's case.
20 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
21 Alternatively, the moving party can demonstrate that the
22 non-moving party cannot provide evidence to support an essential
23 element upon which it will bear the burden of proof at trial.
24 Id.

25      Once the moving party meets its initial burden, the
26 non-moving party must "go beyond the pleadings and by her own
27 affidavits, or by 'the depositions, answers to interrogatories,
28 and admissions on file,' [and] designate 'specific facts showing

12

that there is a genuine issue for trial.'"  <u>Id.</u> at 324 (quoting

Fed. R. Civ. P. 56(e)).  The non-movant "may not rest upon the

mere allegations or denials of the adverse party's pleading."

Fed. R. Civ. P. 56(e); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135,

1137 (9th Cir. 1989).  However, any inferences drawn from the

underlying facts must be viewed in the light most favorable to

the non-moving party.  <u>Matsushita Elec. Indus. Co., Ltd. v.</u>

<u>Zenith Radio Corp</u>., 475 U.S. 574, 587 (1986).  Additionally, the

court must not engage in credibility determinations or weigh the

evidence, for these are jury functions.  <u>Anderson</u>, 477 U.S. at

255.

        Federal Rule of Civil Procedure 56 also allows a court

to grant summary adjudication on part of a claim or defense.  <u>See</u>

Fed. R. Civ. P. 56(b) ("A party against whom a claim . . . is

asserted . . . may, at any time, move . . . for a summary

judgment in the party's favor as to all <u>or any part</u> thereof")

(emphasis added); <u>see also</u> <u>Allstate Ins. Co. v. Madan</u>, 889 F.

Supp. 374, 378-79 (C.D. Cal. 1995); <u>France Stone Co., Inc. v.</u>

<u>Charter Township of Monroe</u>, 790 F. Supp. 707, 710 (E.D. Mich.

1992).  The standard that applies to a motion for summary

adjudication is the same as that which applies to a motion for

summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a), (c); <u>Mora v.</u>

<u>Chem-Tronics, Inc.</u>, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

        In their complaint, plaintiffs brings various claims

for violations of their constitutional rights under 42 U.S.C. §

1983.  Section 1983 is not itself a source of substantive rights,

but merely provides a method for vindicating federal rights that

are conferred elsewhere.  <u>Graham v. Connor</u>, 490 U.S. 386, 394-95

1  (1989).  If a claim under § 1983 is to survive a motion for

2  summary judgment, a plaintiff must show there remains a genuine

3  issue of fact that (1) defendants acted under color of law, and

4  (2) defendants deprived plaintiff of rights secured by the United

5  States Constitution or federal statutes.  <u>Gibson v. U.S.</u>, 781

6  F.2d 1334, 1338 (9th Cir. 1986).

7      A.   <u>Procurement of an Invalid Search Warrant</u>

8          Plaintiffs' first claim for relief under 42 U.S.C. §

9  1983 is based upon their allegations that no probable cause

10  existed for issuance of the search warrant.  Specifically,

11  plaintiffs assert that the officer defendants (1) failed to

12  establish the reliability of witness Shirk; (2) used material

13  representations and omissions in the procurement of the search

14  warrant; and (3) failed to particularize evidence sought under

15  the search warrant.

16          The Fourth Amendment to the United States Constitution,

17  applicable to the states through the Fourteenth Amendment,

18  prohibits searches and arrests without probable cause.  <u>Beck v.</u>

19  <u>Ohio</u>, 379 U.S. 89, 90-91 (1964); <u>McKenzie v. Lamb</u>, 738 F.2d 1005,

20  1007-08 (9th Cir. 1984).  "The long-prevailing standard of

21  probable cause protects 'citizens from rash and unreasonable

22  interferences with privacy and from unfounded charges of crime.'"

23  <u>Maryland v. Pringle</u>, 540 U.S. 366, 370 (2003) (quoting <u>Brinegar</u>

24  <u>v. United States</u>, 338 U.S. 160, 176 (1949)).  However, in

25  reviewing the sufficiency of an affidavit in support of a search

26  warrant, the Supreme Court has "repeatedly said that

27  after-the-fact scrutiny by courts of the sufficiency of an

28  affidavit should not take the form of de novo review.  A

magistrate's determination of probable cause should be paid great deference by reviewing courts.  A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant . . . ."  Illinois v. Gates, 462 U.S. 213, 236 (1983) (internal quotations and citations omitted).  The Supreme Court has further explained:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for concluding" that probable cause existed.

Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)); see also Dawson v. City of Seattle, 435 F.3d 1054, 1062 (9th Cir. 2006) (reviewing a judge's finding of probable cause for the issuance of a search warrant for "clear error"); United States v. Meek, 366 F.3d 705, 712 (9th Cir. 2004) (according "great deference" to the issuing judge's findings).

"Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity . . . innocent behavior frequently will provide the basis for a showing of probable cause."  Gates, 462 U.S. at 245. In this context, probable cause exists if "the evidence, considered by the magistrate, viewed as a whole, would permit a reasonable person to believe that a search . . . had a fair probability of revealing evidence."  Dawson, 435 F.3d at 1062.

1.   Witness Shirk's Identification of Heather Ewing

1     Plaintiffs contend that Shirk's "identification of
2  Heather Ewing was so flawed that it could not reasonably have
3  provided probable cause for the search warrant." (Pls.' Mem. in
4  Opp'n to Officer Defs.' Mot. for Summ. J. 17:1-2.)  However,
5  while assessing the veracity and basis of knowledge supporting
6  the hearsay information is one piece of evaluating whether
7  "probable cause" exists for the issuance of a warrant, there is
8  no particular test for reliability.  Rather, where "an
9  unquestionably honest citizen comes forward with a report of
10 criminal activity--which if fabricated would subject him to
11 criminal liability"--the United States Supreme Court has found
12 rigorous scrutiny of the basis of his knowledge unnecessary.
13 Gates, 462 U.S. at 238.

14     Plaintiffs assert that Shirk had a limited view of the
15 female companion's face and provided an overly general
16 description as to her appearance.  Shirk's view of the female
17 companion's face was not as limited as plaintiffs would have the
18 court believe.  Though by all accounts she was wearing a
19 motorcycle helmet, Shirk told Reyes that she was standing right
20 beside him during the altercation, looking directly "at Mark
21 [Donahue] and I, and I looked at her.  That's how I got a good
22 look at her." (Tr. of Interview with Shirk 2:25-27.)  Shirk also
23 gave a rather detailed description of the female companion,
24 including that she appeared to be in her late twenties or early
25 thirties, stood about 5'6" to 5'7", had a slim build, weighed
26 approximately 120 or 130 pounds, was fair-skinned, had red cheeks
27
28

1 set against pointy cheek bones, and wore a pair of glasses.[14]

2 Moreover, Shirk's general description as to her height and weight

3 largely aligned with the statements of several other witnesses at

4 the incident.  (Search Warrant Ex. B.)

5          Upon seeing the image of Heather Ewing on the Jus'

6 Brothers website, Shirk told Reyes in no uncertain terms that the

7 woman in the images--later confirmed to be Heather Ewing--was the

8 female companion at the incident.  (Tr. of Interview with Brian

9 Shirk 20:8-9 ("I was scanning through the pictures, just clicking

10 one by one and this one [of Heather Ewing] just floored me, I

11 looked at it and I was like ["][T]hat['s her.["]); id. 21:6

12 ("[The image] just looks so much like [the female companion at

13 the incident], she must have a twin sister if it's not her.").)

14          This identification is more than sufficient to satisfy

15 Ninth Circuit indicia of reliability determinations, which

16 "include: 1) the opportunity to view the criminal at the time of

17 the crime; 2) the degree of attention paid to the criminal; 3)

18 the accuracy of the prior descriptions of the criminal; 4) the

19 level of certainty demonstrated at the time of confrontation; and

20 5) and the length of time between the crime and the

21 confrontation."  Grant v. City of Long Beach, 315 F.3d 1081, 1087

22 (9th Cir. 2002) (citing Gray v. Klauser, 282 F.3d 633, 639 (9th

23 Cir. 2002).

24          Here, Shirk was able to stand right next to the female

25

26          [14]    While Shirk also stated that he thought the female
   companion had blonde hair (Heather Ewing has brown hair), he also
27 qualified this discrepant observation by noting that he could not
   be sure because her hair "was mostly covered up by the helmet."
28 (Tr. of Interview with Shirk 18:8-9.)

companion while observing her, made accurate descriptions as to her height, weight, skin tone, etc., and went on the Jus' Brothers Motorcycle Club website less than twenty-four hours after the confrontation and identified her.  From his vantage point, Shirk was not only able to see the female companion but also the subsequent events that led to Donahue's murder.[15]  See Gates, 462 U.S. at 234 (a witness's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case"); United States v. Banks, 539 F.2d 14, 17 (9th Cir. 1976) ("A detailed eyewitness report of crime is self-corroborating; it supplies its own indicia of reliability.").

>    2.   Material Representation in the Procurement of the Search Warrant

"It is clearly established that judicial deception may not be employed to obtain a search warrant." Franks v. Delaware, 438 U.S. 154, 155-56 (1978).  To support a § 1983 claim for judicial deception, a plaintiff must show (1) that the defendant

---

[15]    Plaintiffs also argue that the officers failed to ascertain whether Shirk may have been drinking the night of the incident.  However, officers had interviewed Shirk within minutes of the event and made no notice of any supposed intoxication in their extensive reports.  Cf. United States v. Arvizu, 534 U.S. 266, 277 (2002) (courts afford considerable deference to the observations and conclusions of the police, reasoning that an experienced officer can infer certain subtleties from conduct that seems innocuous to a lay observer).  Plaintiffs have provided no evidence for this court to believe that Shirk was intoxicated or that there was any reason for police to suspect this.  Shirk, who had only arrived at the bar at the start of the altercation, has also declared under the penalty of perjury that he had not drank any alcohol or taken any drugs that night.  (Shirk Decl. ¶ 3.)

1  deliberately or recklessly made false statement(s) or omission(s)

2  that (2) were material to the finding of probable cause.

3  Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126 (9th Cir.

4  2002).   The court determines the materiality of the alleged false

5  statements or omissions.   Butler v. Elle, 281 F.3d 1014, 1024

6  (9th Cir. 2002).

7    Plaintiffs contend that the officer defendants

8  deliberately or recklessly made a false statement related to

9  Heather Ewing's purported criminal background in their affidavit

10  that was material to the Judge McNatt's decision to sign the

11  search warrant.   In the affidavit, Reyes states that

> I (REYES) checked our files for (Heather Marie EWING)
> with negative results. I checked our photo files and
> observed a recent arrest in August 2004 for 273.5 PC
> [domestic assault] via the San Joaquin Sheriff's
> Department, however I was not able to retrieve the
> photograph, as the equipment was not functioning
> properly.

16  (Search Warrant Ex. B 13:8-11.)   What Reyes neglected to say in

17  the affidavit was that the photo file was under the name

18  "Nicolette Marie Ewing" as opposed to "Heather Marie Ewing."

19  Reyes concedes that he noticed the distinction in names at that

20  time, but he asserts that without the photo he was unable to

21  ascertain whether Nicolette and Heather were in fact different

22  people.   Given the importance of a citizen's constitutional

23  rights to be free from unreasonable search and seizure, making

24  the assumption that a suspect has a criminal record based only on

25  her sharing of a common middle and last name with someone else

26  is, at the very least, a negligent error the part of a police

officer.[16]  See U.S. v. Stevens, No. 06-0139, 2006 WL 3692429, at
*5-*6 (N.D. Iowa Dec. 13, 2006) ("Officer Denlinger's erroneous
inclusion of criminal history information was negligent."). 
Reyes compounded this error by his failure to mention the name
distinction in the actual affidavit, thus leaving Judge McNatt
with only the insufficient disclaimer that an accompanying
photograph of the suspect was not available.

            Viewing these underlying facts in the light most
favorable to plaintiffs, the act of including this false
representation of criminal history in the affidavit supporting a
search warrant may well signify a reckless disregard for the
truth.  Thus, at the summary judgment stage, the court cannot
find that plaintiffs' are unable to satisfy the first prong of
their § 1983 claim for judicial deception.  However, plaintiffs
must also establish that the false representation was a material
to the finding of probable cause--i.e., "that, but for this
dishonesty, the challenged action would not have occurred." 
Hervey v. Estes, 65 F.3d 784, 788-89 (9th Cir. 1995) (citing
Branch v. Tunnell, 937 F.2d 1382, 1388 (9th Cir. 1991)).  If
there is sufficient content in the affidavit apart from the
challenged material to support a finding of probable cause, the
misrepresentation will not be considered material.  Mills v.
Graves, 930 F.2d 729, 733 (9th Cir. 1991); see also Illinois v.

---

[16]      Reyes concedes that he could have made a call to the
Sheriff's Department in order to ascertain the vital statistics
of Nicolette Marie Ewing and compare them to Heather Ewing. 
(Reyes Dep. 218:20-219:12.)  If he had done so, Reyes would have
found that Nicolette Marie Ewing was ten years younger, three
inches shorter, thirty pounds heavier, and lived in a different
city than Heather Ewing.  (Pls.' Stmt. of Disputed Facts # 42.)

1  <u>Gates</u>, 462 U.S. 213, 233 (1983) (under a totality of the
2  circumstances analysis, "a deficiency in one [area] may be
3  compensated for, in determining the overall reliability of a tip,
4  by a strong showing as to the other, or by some other indicia of
5  reliability").

6          Here, the misrepresentation of Heather Ewing's criminal
7  record does not foreclose a finding of probable cause.  While a
8  notation of criminal history in the affidavit often plays a role
9  in the procurement of a search warrant, this is often because it
10 is either related to omissions of an informant's criminal past,
11 <u>see</u> <u>U.S. v. Hall</u>, 113 F.3d 157, 159 (9th Cir. 1997) (state
12 trooper's failure to disclose convictions that bore on
13 informant's testimony rendered informant's already weak testimony
14 insufficient to support issuance of warrant to search defendant's
15 trailer), or when the suspect's instant offense is predicated on
16 his or her past criminal violation(s).  <u>See</u> <u>U.S. v. Van Blericom</u>,
17 No. 93-165, 1993 WL 513237, at *1 (D. Or. 1993) (noting that the
18 officers' affidavit "states in support of the search warrant the
19 criminal history of [suspect], thereby establishing that he is a
20 person prohibited by law from legally possessing any type of
21 firearm").

22         The remainder of the search warrant and affidavit
23 accurately recount the events that would support Judge McNatt's
24 practical, common-sense decision whether, given all the
25 legitimate circumstances set forth in the affidavit before him,
26 there is a fair probability that contraband or evidence of a
27
28

crime will be found at the Ewing residence.[17]  <u>Gates</u>, 462 U.S. at
238-39.  The affidavit accurately recounts testimony that the
female companion instigated a confrontation with Donahue, called
over a member of the Jus' Brothers Motorcycle Club who hit
Donahue on the head with a large flashlight before stabbing him
with a knife, and then fled the scene on the back of this Jus'
Brother member's motorcycle.

        The affidavit also supplements this myriad of witness
testimony with Shirk's subsequent identification of the female
companion--determined by Investigator Bertocchini to be Heather
Ewing--from images located on the Jus' Brothers Motorcycle Club
website.  Heather Ewing's vital statistics not only were a
relative match to those recounted by the witnesses, but she was
married to and lived with Jus' Brothers member Mark Ewing.[18]

---

[17]    In addition to the misrepresentation of Heather Ewing's
criminal history, plaintiffs contend that the officer defendants
omitted significant evidence from the warrant.  (Pls.' Mem. in
Opp'n to Defs.' Mot. for Summ. J. 24-25.)  Rather than
substantively debasing a finding of probable cause to search the
Ewing residence, most of these contentions are simply duplicate
arguments as to the reliability of Shirk.  Nonetheless, the court
finds one omission particularly troublesome.  Though he had no
knowledge of the female companion or her husband's actual names,
Shirk also told Reyes that the name of the Jus' Brothers member
called over by the female companion "might have had [a] K type of
sound at the end of it, like a Mike or Jack."  (Tr. of Interview
with Shirk 9:6-8.)  But the affidavit omits the "might" language
and recounts this statement with an unreasonable air of certainty
(Search Warrant Ex. B 14:5-6 (recounting that Shirk said "the
name ended with the letter "K").)  Therefore, the court will also
excise this statement from the affidavit while making its
determination of probable cause.  Like the analysis above,
however, the court finds there is sufficient content in the
affidavit apart from this statement to support a finding of
probable cause to search the Ewing residence.

[18]    While only Heather Ewing was formally listed as a
suspect for her purported role as an accomplice or aidder and
abettor in the Donahue murder, Hutto logically maintained a

Therefore, even absent the criminal history, the affidavit sufficiently states evidence supporting the probability that objects of the prospective search--e.g., traces of hair, blood, or fingerprints, witness-described items of clothing that may have contained bodily fluid, a large flashlight, the knife used to stab Donahue, a matching motorcycle, etc.--might be found at the Ewing residence. Mills, 930 F.2d at 733 ("Even without the questionable statements of Mills' criminal past and present, there was probable cause to search [§ 1983 plaintiffs'] property"); see also Gates, 462 U.S. at 235 ("[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969))); Durham v. United States, 403 F.2d 190, 193 (9th Cir. 1968) ("The facts . . . must be sufficient to justify a conclusion . . . that the property which is the object of the search is probably on the person or

---

reasonable suspicion that the Jus' Brothers member called over to battle Donahue was Mark Ewing. Not only did the Jus' Brothers member respond immediately, but the female companion subsequently climbed on the back of his bike and they drove off together. In the affidavit, Hutto stated that "[b]ased on my training and experience, as well as the above facts, I believe Heather Marie Ewing and possibly her husband Mark Lee Ewing may have been involved in the homicide . . . . I also believe there is evidence related to the crime of homicide located at [the Ewing residence]. (Search Warrant Ex. B 15:18-22.) While Hutto's suspicion that Mark Ewing was the Jus' Brothers member at the bar is admittedly not ironclad, law enforcement officers are commonly--and reasonably--forced to make investigative conclusions based on their own experiences. See United States v. Ventresca, 380 U.S. 102, 108 (1965) (in analyzing whether probable cause exists, the courts have recognized that search warrants are normally drafted in the haste and uncertainty of an on-going criminal investigation); United States v. Martin, 920 F.2d 393, 398-99 (6th Cir.1990) (finding that because judgments are made on the basis of developing facts, affidavits necessarily and, appropriately, often contain conclusions based on the officers' experiences.).

1  premises to be searched at the time the warrant is issued.").

2        3.   <u>Failure to Particularize Evidence Sought Under the</u>
3             <u>Search Warrant</u>

4        The Fourth Amendment requires that a warrant
5  particularly describe both the place to be searched and the
6  person or things to be seized.  The description must be specific
7  enough to enable the person conducting the search reasonably to
8  identify the things authorized to be seized.  <u>United States v.</u>
9  <u>McClintock</u>, 748 F.2d 1278, 1282 (9th Cir. 1984); <u>United States v.</u>
10 <u>Hillyard</u>, 677 F.2d 1336, 1339 (9th Cir. 1982).  This requirement
11 prevents general, exploratory searches and indiscriminate
12 rummaging through a person's belongings.  <u>McClintock</u>, 748 F.2d at
13 1282.  It also ensures that the magistrate issuing the warrant is
14 fully apprised of the scope of the search and can thus accurately
15 determine whether the entire search is supported by probable
16 cause.  <u>Hillyard</u>, 677 F.2d at 1339.

17       The specificity required in a warrant varies depending
18 on the circumstances of the case and the type of items involved.
19 <u>United States v. Spilotro</u>, 800 F.2d 959, 964 (9th Cir. 1986).
20 Although the police are not allowed to exercise discretion as to
21 items to be seized, <u>Marron v. United States</u>, 275 U.S. 192, 196
22 (1927), the warrant's description of items need only be
23 "'reasonably specific, rather than elaborately detailed . . . .'"
24 <u>United States v. Storage Spaces Designated Nos. 8 & 49</u>, 777 F.2d
25 1363, 1368 (9th Cir. 1985) (quoting <u>United States v. Brock</u>, 667
26 F.2d 1311, 1322 (9th Cir. 1982)).  In determining whether a
27 description is sufficiently precise, the Ninth Circuit has
28 concentrated on one or more of the following: (1) whether

24

1  probable cause exists to seize all items of a particular type

2  described in the warrant; (2) whether the warrant sets out

3  objective standards by which executing officers can differentiate

4  items subject to seizure from those which are not; and (3)

5  whether the government was able to describe the items more

6  particularly in light of the information available to it at the

7  time the warrant was issued.  Spilotro, 800 F.2d at 964.

8       Plaintiffs contend that the search warrant failed to

9  particularize the description of items related to the November 5

10 incident and, to the point it included provisions allowing for

11 the search and seizure of items unrelated to the incident, was

12 unconstitutionally overbroad.  Regarding the items related to the

13 incident (listed in paragraphs 1, 2, 3, 4, and 6 of the Search

14 Warrant's Exhibit A), the court finds that the officer defendants

15 clearly articulated what items were to be seized and how they

16 related to the Donahue murder.  For example, the warrant calls

17 for seizure of

18
19    2.   Items of clothing worn by the suspect during the
           commission of the crime; any clothing which may
20         contain bodily fluid, such as blood, semen, saliva,
           etc . . . .  This is to include black leather
21         jacket or vest with "JUS BROTHERS" written on the
           back, blue jean pants, and black motorcycle helmets
22         which the "suspects" were described as wearing
           during the incident.
23    3.   Any weapon(s) that may have been used to commit
           this offense.  This is to include any knives,
24         flashlights, and tools that could match the
           weapon(s) used in the commission of the crime.
25    4.   Any trace of evidence; hair, blood, natural fibers,
           latent fingerprints of the suspect.

26 (Search Warrant Ex. A).  Such descriptions not only negate

27 instances of exploratory searches and indiscriminate rummaging,

28 but contain sufficient detail to enable those conducting the

1  search to reasonably identify the items authorized to be seized.

2  McClintock, 748 F.2d at 1282.

3        Plaintiffs nonetheless argue that the warrant was

4  overly generic in light of several witnesses' detailed accounts

5  regarding the knife, flashlight, and clothing.  However,

6  plaintiffs concede that many of the witness accounts varied as to

7  color and size of specific items, thus negating a true and exact

8  depiction of each item.  Warrants that describe generic

9  categories of items are not necessarily invalid if a more precise

10  description of the items subject to seizure is not possible.

11  United States v. Cardwell, 680 F.2d 75, 78 (9th Cir. 1982).

12  Thus, it was reasonable for the officer defendants to include the

13  generic terms like "knives" or "flashlights" when considering the

14  amorphous witness descriptions and the probability that these

15  weapons would provide traces of evidence from a homicide scene.

16  Any assumed deficiency is further offset by Hutto's attached--and

17  thus incorporated--affidavit, which included the several

18  statements from witnesses citing their individual descriptions of

19  the items.  See United States v. Fannin, 817 F.2d 1379, 1384 (9th

20  Cir. 1987) ("Although the 'other evidence' language of the

21  warrant is not sufficiently particular standing alone, that

22  deficiency was cured by the particularity of the attached and

23  incorporated affidavit.").

24        The search warrant also includes an extensive

25  instruction related to the search and seizure of Jus' Brothers

26  Motorcycle Club material, gang affiliation, and records of

27  gang-related activity (written or computerized).  (Search Warrant

28  Ex. A ¶ 6.)  While sensitive to an argument that there was no

evidence of a broad, gang-related conspiracy related to the November 5 incident, search and seizure of the Jus' Brothers Motorcycle Club material--even if arguably broad--must be interpreted by magistrates and courts in a commonsense and realistic fashion. United States v. Ventresca, 380 U.S. 102, 108 (1965).

In this view, the court cannot find the officer defendants as engaging in an overly-opportunistic search aimed at securing incriminating information about the Jus' Brothers Motorcycle Club unrelated to the November 5 incident.  Rather, a commonsense construction demonstrates a search and seizure that readily relates the Donahue murder:  The analysis of the Jus' Brothers materials could not only enhance the case against Heather Ewing, but certain materials (e.g., the search and seizure of "[a]ny current phone numbers, addresses of fellow gang members with whom [the Ewings] associate" (Search Warrant, Ex. A ¶ 6)) could also presumably lead to the person and/or location of the remaining suspect(s). See Ventresca, 380 U.S. at 108 ("[Search warrants] are normally drafted by nonlawyers in the midst and haste of a criminal investigation.  Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.").  Therefore, the court finds that the search warrant, via paragraphs 1, 2, 3, 4, and 6, was sufficiently particularized as to the description of the items related to the November 5 incident.

In contrast, at this juncture the court cannot find that the search warrant's provisions allowing for the search and seizure of items unrelated to the November 5 incident--listed

under paragraphs 5 and 7--are supported by probable cause.
Specifically, neither the search warrant, the affidavit, nor a
commonsense appraisal of the crime provide a sufficient basis for
permitting seizure of "narcotics or narcotic paraphernalia" and
"all electronic data processing and storage devices, computers
and computer systems."[19]  (Search Warrant Ex. A ¶¶ 5, 7.)

There was no evidence of narcotics activity surrounding
the November 5 incident.  In an apparent act of concession, the
officer defendants have not addressed this point in their papers.
Therefore, the court cannot confirm that probable cause existed
to conduct a search specifically for narcotics.  See Berger v.
New York, 388 U.S. 41, 69 (1967) (Stewart, J., concurring) ("The
standard of reasonableness embodied in the Fourth Amendment
demands that the showing of justification match the degree of
intrusion.").

With respect to the search and seizure of "all"
computers and any files therein, the Ninth Circuit "do[es] not
approve of issuing warrants authorizing blanket removal of all
computer storage media for later examination when there is no
affidavit giving a reasonable explanation . . . as to why a
wholesale seizure is necessary."  U.S. v. Hill, 459 F.3d 966, 976
(9th Cir. 2006).  Hypothetically, if the officer defendants hoped

---

[19]  Plaintiffs also contend that the warrant
inappropriately contained provisions allowing for search and
seizure related to firearms possession.  (Pls.' Mem. in Opp'n to
Officer Defs.' Mot. for Summ. J. 26:15-16.)  However, the warrant
contains no such provision.  Rather, the warrant properly limits
the search and seizure to "[a]ny weapon(s) that may have been
used to commit this offense.  This is to include any knives,
flashlights, and tools that could match the weapon(s) used in the
commission of the crime."  (Search Warrant Ex. A ¶ 3.)

to recover a recent email correspondence or online diary/journal that may have mentioned the November 5 incident, they should have made mention of such intent. U.S. v. Grimmett, 439 F.3d 1263, 1270 (10th Cir. 2006) (when applying for a warrant to search a computer, "officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant"). Further, while the court approved the search and seizure of Jus' Brothers Motorcylce Club material including computerized references to membership, etc., the warrant and affidavit make no attempt to limit the computer search and seizure to these materials. Hill, 459 F.3d at 975 ("[T]here must be some threshold showing before the government may "seize the haystack to look for the needle"); see also United States v. Tamura, 694 F.2d 591, 595 (9th Cir. 1982) ("[T]he wholesale seizure for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent'" (quoting United States v. Abrams, 615 F.2d 541, 543 (1st Cir. 1980)).

        In light of the court's finding that part of the search warrant was sufficiently particular and supported by probable cause to support a ruling of summary judgment for defendants while part of it was not, the question becomes whether this court--assuming the subsequent trial confirms that the search and seizure provisions unrelated to the November 5 incident lacked probable cause--could render the entire search unconstitutional or only that portion conducted pursuant to the apparent invalid

part of the search warrant.  If the answer is the former, then
the court cannot, at this time, grant summary judgment to
defendants on provisions of the warrant deemed constitutional.
If the answer is the latter, then the court may grant summary
judgment to defendants with respect to the constitutional
portions of the search warrant while staying a determination of
probable cause as to the rest of the warrant until trial.

        In the criminal context, courts have used the doctrine
of severance, or partial suppression, to sever valid portions of
a warrant from invalid portions.  Under this doctrine, evidence
seized pursuant to the invalid portions of the warrant is
suppressed, while items seized under the valid portions is
admissible in the ensuing criminal prosecution.  <u>See</u> <u>United
States v. Gomez-Soto</u>, 723 F.2d 649, 654 (9th Cir. 1984) ("This
court has embraced the doctrine of severance, which allows us to
strike from a warrant those portions that are invalid and
preserve those portions that satisfy the fourth amendment"); <u>see
also</u> 2 W. LaFave, <u>Search and Seizure: A Treatise on the Fourth
Amendment</u> § 4.6(f) at 258-59 (2d ed. 1987) ("It would be harsh
medicine indeed if a warrant which was issued on probable cause
and which did particularly describe certain items were to be
invalidated in toto merely because the affiant and the magistrate
erred in seeking and permitting a search for other items as
well.").

        Although normally raised in criminal suppression
motions, the doctrine of severance is also applicable to § 1983
proceedings.  <u>Naugle v. Witney</u>, 755 F.Supp. 1504, 1516-18 (D.
Utah 1990) ("It would seem highly anomalous for this court to

30

allow the admission of evidence obtained pursuant to the valid portion of this Warrant in a criminal trial while holding defendants civilly liable for the search and seizure of that same evidence."); cf. Baldwin v. Placer County, 418 F.3d 966, 971 (9th Cir. 2005) (section 1983 action discussing redaction of the portions of an affidavit to determine whether probable cause remained absent the improper information).  The Fourth Amendment is not applied with zero-sum force in the criminal context, and the court identifies no compelling policy reasons why it should be so applied in the civil context.  Naugle, 755 F.Supp. at 1517.

       For the foregoing reasons, the court finds that severance of the search warrant is proper.  Defendants are not liable under § 1983 for that part of the search and seizure conducted pursuant to the valid portions of the search warrant. Absent immunity or some other defense, however, defendants remain open to liability for their search and seizure conducted pursuant to the ostensibly invalid portions of the search warrant.

                    a.   Qualified Immunity of the Officer Defendants

       The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitution rights of which a reasonable person should have known."  Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (internal quotations omitted).  A right is clearly established when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Camarillo v.

1  McCarthy, 998 F.2d 638, 640 (9th Cir. 1993) (citing Anderson v.

2  Creighton, 483 U.S. 635, 640 (1987)) (internal quotations

3  omitted).

4          The initial inquiry that the court must make to

5  determine whether an official is entitled to qualified immunity

6  is whether, "[t]aken in the light most favorable to the party

7  asserting the injury, do the facts alleged show the officer's

8  conduct violated a constitutional right?" Saucier v. Katz, 533

9  U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232

10  (1991)). The next inquiry is whether the constitutional right

11  was clearly established. Id. This inquiry must be taken in the

12  light of the specific context of the case. The salient question

13  is whether the law at the time of the disputed conduct gave

14  defendants "fair warning that their alleged treatment of

15  plaintiffs was unconstitutional." Id. at 741.

16          The question of immunity generally is not one for the

17  jury. However, if a genuine issue of material fact exists

18  regarding the circumstances under which the officer acted, then

19  the court should make the determination after the facts have been

20  developed at trial. Act Up!\Portland v. Bagley, 988 F.2d 868,

21  873 (9th Cir. 1993). But when the facts are not in dispute, the

22  court is to resolve all the issues relating to whether qualified

23  immunity applies. See Hunter v. Bryant, 502 U.S. 224, 228 (1991)

24  ("Immunity ordinarily should be decided by the court long before

25  trial.").

26          Here, the court has determined that there is no genuine

27  issue of material fact that probable cause existed for issuance

28  of the paragraphs 1, 2, 3, 4, and 6 of the search warrant as

delineated above.  Under the initial <u>Saucier</u> inquiry, all
searches and seizures conducted pursuant to this portion of the
search warrant did not violate plaintiffs' constitutional rights.
Therefore, the officer defendants are not liable for any of
plaintiffs' alleged injuries if they were incurred during search
and seizure of the items listed under paragraphs 1, 2, 3, 4, and
6 of the search warrant.

As for paragraphs 5 and 7 of the search warrant (the
instructions unrelated to the November 5 incident), the court
cannot confirm the existence of probable cause at this stage of
the litigation due to a lack of particularity.  If at trial it is
found that the search warrant indeed lacks particularity, and
given that this requirement is set forth in the text of the
Constitution, then no reasonable officer could believe that a
search warrant that does not comply with this requirement was
valid.  <u>See</u> <u>Groh v. Ramirez</u>, 540 U.S. 551, 563 (2004) ("If the
law was clearly established, the immunity defense ordinarily
should fail, since a reasonably competent public official should
know the law governing his conduct" (quoting <u>Harlow v.</u>
<u>Fitzgerald</u>, 457 U.S. 800, 818-819 (1982)).  Moreover, because the
officer defendants themselves prepared the search warrant, they
may not argue that they reasonably relied on the Judge McNatt's
assurance that the search warrant contained an adequate
description of the things to be seized and was therefore valid.
<u>Id.</u> at 564.  Thus, on their motion for summary judgment or, in
the alternative, summary adjudication, defendants are not
entitled to qualified immunity with respect to items seized under
paragraphs 5 and 7 of the search warrant.

1    Accordingly, the court will grant the officer
2    defendants' motion for summary adjudication with respect to
3    plaintiffs' § 1983 claim for procurement of an invalid search
4    warrant.  As a matter of law, the officer defendants are not
5    liable under § 1983 for that part of the search and seizure
6    conducted pursuant to the paragraphs 1, 2, 3, 4, and 6 of the
7    search warrant.  In turn, the court will deny the officer
8    defendants' motion for summary adjudication with respect to
9    plaintiffs' § 1983 claim for procurement of an invalid search
10   warrant as it relates to paragraphs 5 and 7 of the warrant.

11        B.   <u>Compliance with the Knock-and-Announce Rule During the</u>
12             <u>Execution of Warrant</u>

13        The Fourth Amendment "mandate[s] that police officers
14   entering a dwelling pursuant to a search warrant announce their
15   purpose and authority and either wait a reasonable amount of time
16   or be refused admittance before forcibly entering [a] residence."
17   <u>United States v. Bynum</u>, 362 F.3d 574, 579 (9th Cir. 2004) (citing
18   <u>Wilson v. Arkansas</u>, 514 U.S. 927, 933-35 (1995)). Plaintiffs
19   contend that the SPD SWAT Team did not give a
20   "knock-and-announce" notice when they served the search warrant
21   at the Ewing residence.  Defendants concede that the SWAT Team
22   did not conduct a formal knock-and-announce, but argue that there
23   was no need to give notice because Heather Ewing made eye contact
24   with a SWAT Team member through the glass on her front door.
25   Heather Ewing denies defendants version of events, and thus it
26   appears a genuine issue of material fact precludes summary
27   judgment.

28        It is well established, however, that liability under §

34

1983 arises only upon a showing of personal participation by the

defendant(s).  Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir.

1979); see also Cunningham v. Gates, 229 F.3d 1271, 1289 (9th

Cir. 2000) (concluding that officers who were not present at the

time of the shootings could not be liable under § 1983 for

failure to intercede, and that the non-shooting officers who were

present had no realistic opportunity to intercede so they, too,

could not be liable).  Evidently recognizing this limitation,

plaintiffs use all of one sentence to link the officer

defendants--none of whom were on the SWAT Team the day the search

warrant was served--to the violation by referring to them as the

SWAT Team's apparent supervisors.  (See Pls.' Mem. in Opp'n to

Officer Defs.' Mot. for Summ. J. 34:23-24 ("The [officer

defendants] must concede that the SWAT Team under their direction

did not give knock notice") (emphasis added).)  But plaintiffs

offer no evidence to support this contention and have made no

showing that any of the officer defendants directed, participated

in, or had knowledge of any alleged misconduct on the part of

SWAT Team.  Rather, the evidence demonstrates that only SWAT Team

members participated in the initial service of the search

warrant; the rest of the officers did not enter the Ewing

residence until after the SWAT Team had secured the premises.

        By all accounts, police sergeant and SWAT Team leader

Anthony McKee, not the officer defendants, assumed the supervisor

role the day the search warrant was served at the Ewing

residence.  (See McKee Decl. ¶ 3 ("On November 8, 2004, I was the

sergeant in charge of the SWAT Team that was assigned to serve a

search warrant at 405 South Carroll Street, Stockton,

California.").)   SWAT member Steven Peppard also testified that the authority to convene the SWAT Team with respect to the execution of a search warrant is in the hands of "the lieutenant of the special investigation section and the SWAT commander." (Peppard Dep. 44:12-14.)

Assuming arguendo that the officer defendants actually occupied a supervisory role, plaintiffs are still unable to show any participation that would have made them liable for the SWAT Team's alleged violation because "plaintiffs provide no evidence that merely authorizing the SWAT Team to move forward with the warrant would result in constitutional violation and importantly." Davage v. City of Eugene, No. 04-6321, 2007 WL 2007979, at *14 (D. Or. July 6, 2007); see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("[A] supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.  There is no respondeat superior liability under § 1983) (citing Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984)).

Accordingly, because a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data, Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1981), the court will grant the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim that the officer defendants violated the knock-and-announce rule.

C.   Use of Excessive Force During the Execution of the

1          <u>Search Warrant</u>

2          Plaintiffs also contend that the SWAT Team used

3    excessive force during its execution of the search warrant when

4    they pointed their guns at the Ewing's nine-year-old daughter,

5    Katelyn.  Analogous to their allegations concerning violation of

6    the knock-and-announce rule, this contention presents a genuine

7    issue of material fact.  However, plaintiffs have again made no

8    showing that any of the officer defendants directed, participated

9    in, or had knowledge of any alleged misconduct on the part of the

10   SWAT Team.  Similarly, plaintiffs offer no evidence that the

11   officer defendants assumed a supervisory role.  <u>See</u> <u>Lolli v.</u>

12   <u>County of Orange</u>, 351 F.3d 410, 418 (9th Cir. 2003) ("[Plaintiff]

13   has not presented evidence from which a jury could conclude that

14   these defendants should be held liable for the alleged use of

15   excessive force against [plaintiff]; he has not demonstrated that

16   they were present . . . , much less that they had any involvement

17   in the incidents that unfolded.").  Accordingly, the court will

18   grant the officer defendants' motion for summary judgment with

19   respect to plaintiffs' § 1983 claim that the officer defendants

20   used excessive force during execution of the search warrant.

21        D.   <u>Arrest of Mark and Heather Ewing on Gun and Drug</u>

22             <u>Charges</u>

23        A warrantless arrest by an officer is reasonable under

24   the Fourth Amendment where there is probable cause to believe

25   that a criminal offense has been or is being committed.

26   <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004) (citing <u>United</u>

27   <u>States v. Watson</u>, 423 U.S. 411, 417-424 (1976)).  "Probable cause

28   to arrest exists when officers have knowledge or reasonably

                                   37

trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir.2007) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  Whether such probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.  Maryland v. Pringle, 540 U.S. 366, 371 (2003).  Thus, the specific circumstances surrounding the arrest are an indispensable part of the analysis:  "[W]e examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."  Id. (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).

### 1.   Heather Ewing

During their search of the Ewing residence, the officer defendants discovered three marijuana plants in the basement, one ounce of marijuana in the laundry room, and a handgun on top of a television in the master bedroom.  (Alonso Decl. Ex. EE (Kamigaki Incident Report 1-4).)  Based on this evidence, Reyes subsequently arrested Heather Ewing on gun and drug charges.  As the court determined above, firearms were not listed in the search warrant, and the search warrant's provision allowing for the search and seizure of narcotics had not been satisfactorily supported by probable cause.  See supra section II.A.3.  However, the officer defendants assert that seizure of this evidence was proper because their discovery was made in accordance to the doctrine of plain view.

1    "[T]he police may seize any evidence that is in plain

2  view during the course of their legitimate emergency activities."

3  Mincey v. Arizona, 437 U.S. 385,  393 (1978) (citations and

4  emphasis omitted); United States v. Cervantes, 219 F.3d 882, 888

5  (9th Cir. 2000).  "To fall within the plain view exception, two

6  requirements must be met: the officers must be lawfully searching

7  the area where the evidence is found and the incriminatory nature

8  of the evidence must be immediately apparent."  Roe v. Sherry, 91

9  F.3d 1270, 1272 (9th Cir. 1996) (citing  Horton v. California,

10  496 U.S. 128, 135-37 (1990)).  Because plaintiffs do not contest

11  that the incriminatory nature of the evidence was immediately

12  apparent, the court will confine its analysis to the first

13  requirement.

14    The court found above that probable cause existed to

15  search areas of the Ewing residence where there was a likelihood

16  of locating items listed in paragraphs 1, 2, 3, 4, and 6 of the

17  search warrant.  Therefore, in order to succeed on summary

18  judgment, the officer defendants must demonstrate that,

19  consistent with the valid portions of the search warrant, they

20  were lawfully searching the areas where the marijuana and gun

21  were found.  Plaintiffs may be tempted to paint the marijuana and

22  gun as products of an illegal search conducted under paragraphs 5

23  and 7 of the search warrant (which lacked sufficient probable

24  cause as this summary judgment juncture).  However, because

25  paragraphs 1, 2, 3, 4, and 6 of the search warrant properly

26  listed items as varied as fingerprints, knives, flashlights,

27  vehicles, tools, clothing, etc., it was inevitable that the

28  officer defendants would have lawfully searched the basement, the

1 laundry room, and the master bedroom for those items.

2        Moreover, had the officer defendants discovered the
3 marijuana and gun while searching for items pursuant to
4 paragraphs 5 and 7, their state of mind is irrelevant because the
5 circumstances, viewed objectively, legitimized the search of
6 these areas.  See Whren v. United States, 517 U.S. 806, 812-813
7 (1996) (an arresting officer's state of mind is irrelevant to the
8 existence of probable cause); id. at 814 ("[T]he Fourth
9 Amendment's concern with 'reasonableness' allows certain actions
10 to be taken in certain circumstances, whatever the subjective
11 intent.").  In other words, the officer defendants' subjective
12 reasons for searching the basement, laundry room, or master
13 bedroom need not have been to find items as to which there was
14 probable cause.  "[T]he fact that the officer does not have the
15 state of mind which is hypothecated by the reasons which provide
16 the legal justification for the officer's action does not
17 invalidate the action taken as long as the circumstances, viewed
18 objectively, justify that action."  Id. at 813 (quoting Scott v.
19 United States, 436 U.S. 128, 138 (1978)).

20        Because the officer defendants were legally justified
21 to search any area of the house where the items listed in the
22 valid portion of the warrant may be found, the ultimate seizure
23 of the plain view evidence was permissible.  Therefore, they had
24 probable cause to arrest Heather Ewing on gun and drug charges.
25 See United States v. Valencia-Amezcua, 278 F.3d 901, 906-07 (9th
26 Cir. 2002) (officers have probable cause to arrest defendant upon
27 a finding of narcotics within his home).  Accordingly, the court
28 will grant the officer defendants' motion for summary judgment

40

with respect to plaintiffs' § 1983 claim for the false arrest of Heather Ewing on gun and drug charges.

### 2.   Mark Ewing

Plaintiffs' contend that the arrest of Mark Ewing lacked probable cause because he was "arrested" before the officer defendants had discovered the marijuana and handgun at the Ewing residence.  On the morning that the search warrant was executed, Mark Ewing left for work in a vehicle--which was listed in the search warrant--just prior to the SWAT Team's entry into the Ewing residence.  The police subsequently stopped and detained him at a gas station, and Detective Capps searched the vehicle pursuant to the search warrant.  After Capps retrieved two cellular phones from the vehicle, Mark Ewing was arrested[20] when the officer defendants refused to set him free; instead, Capps had patrolmen transport him to the SEB.[21]

Capps asserts that while he was at the gas station searching the vehicle, he received a notice via radio from

---

[20]   Though Reyes formally arrested Mark Ewing back at the SEB later that day, defendants concede that Mark Ewing was "arrested" when, following the conclusion of the vehicle search, he was transported to the SEB.  United States v. Strickler, 490 F.2d 378, at 380 (9th Cir. 1974) (a person is arrested when they "are not free to leave" or officers completely restrict their "liberty of movement") (citations omitted); see also United States v. Johnson, 626 F.2d 753, 755 (9th Cir. 1980) (a "primary" consideration in determining whether an arrest has occurred is "whether or not the defendant was free to choose between terminating or continuing the encounter with law enforcement officers") (citations omitted).

[21]   Following his search of the vehicle, Capps left the gas station and proceeded directly to the Ewing residence to partake in the search of the home.  (Capps Dep. 54:12-14.)

Reyes[22] that marijuana and a gun had been found at the Ewing residence.  Capps stresses that he had Mark Ewing transported to the SEB only after receiving this indicia of probable cause. (Capps Dep. 45:10-23.)  However, Capps testimony is disputed by the testimony of Detective Kamigaki, who stated that the search of the Ewing residence did not begin until Capps arrived at the premises.  (Kamigaki Dep. 33:11-13.)  It follows that if the search in fact did not begin until Capps arrived at the Ewing residence, then the plain view evidence--i.e., the probable cause to arrest Mark Ewing--had not yet been discovered when Capps had Mark Ewing transported to the SEB.[23]

Capps and Kamigaki's conflicting testimony presents a genuine issue of material fact as to the existence of probable

---

[22]    Reyes did not testify that he conveyed this information to Capps, did not recall speaking with Capps, and did not know exactly when he learned of the marijuana grow.  (Reyes Dep. 299:14-23.)  Hutto also testified that he did not speak to anyone connected with the high-risk stop.  (Hutto Dep. 235:24- 236:1.)

[23]    In a declaration filed concurrently with the officer defendants' instant motion, SWAT Team leader Anthony McKee states that he in fact discovered the three marijuana plants during the SWAT Team's initial execution of the search warrant (prior to the commencement of the officer defendants' ensuing search).  (McKee Decl. ¶ 21.)  McKee asserts that he immediately notified the detectives of this discovery.  (See id. ("During my search of the residence, I immediately identified a marijuana cultivation in the basement and notified detectives of this observation.").)  While McKee's statement supports the inference that the marijuana was discovered prior to Capps' arrival, this assertion is not reflected in any of the officer defendants' incident reports.  Rather, Kamigaki's incident report detailing the officer defendants' subsequent search describes heading down a stairwell to the east basement and therein discovering the marijuana plants.  (Alonso Decl. Ex. I (Kamigaki Incident Report 4).)

1   cause in the arrest of Mark Ewing on gun and drug charges.[24]

2   Accordingly, the court cannot grant the officer defendants motion

3   for summary judgment unless they are entitled to immunity.

4                  a.   Qualified Immunity of the Officer Defendants

5              While the question of qualified immunity generally is

6   not one for the jury, the court should make the determination

7   only after the facts have been developed at trial if a genuine

8   issue of material fact exists regarding the circumstances under

9   which the officer acted.   Act Up!\Portland v. Bagley, 988 F.2d

10  868, 873 (9th Cir. 1993); see also United States v. Greene, 783

11  F.2d 1364, 1367 (9th Cir. 1986) (when the facts underlying

12  immunity inquiries are in dispute, then it is for the jury to

13  resolve the factual dispute so that the district court may decide

14  "whether those facts support an objective belief that probable

15  cause . . . existed").   Here, a genuine issue of fact remains as

16  to whether Reyes relayed the evidentiary discovery to Capps prior

17  to the arrest of Mark Ewing.   Accordingly, the court will deny

18  the officer defendants' motion for summary judgment with respect

19

20          [24]   The officer defendants make a haphazard argument that
     Capps, even without receiving the radio notice from Reyes, had
21   probable cause to arrest Mark Ewing based on the doctrine of
     collective knowledge.   "Where law enforcement authorities are
22   cooperating in an investigation [], the knowledge of one is
     presumed shared by all."   United States v. Jensen, 425 F.3d 698,
23   704-05 (9th Cir. 2005) (quoting Illinois v. Andreas, 463 U.S.
     765, 772 n.5 (1983)).   However, while the arresting officer may
24   not be aware of every aspect of the investigation, there must be
     a minimal amount of "communication among agents [so that]
25   probable cause can rest upon the investigating agents' collective
     knowledge."   United States v. Del Vizo, 918 F.2d 821, 826 (9th
26   Cir. 1990) (internal quotations and omitted); see also United
     States v. Sandoval-Venegas, 292 F.3d 1101, 1105-06 (9th Cir.
27   2002).   Here, the officer defendants have not shown that, absent
     the Reyes notification, Capps would have any indicia of probable
28   cause to believe Mark Ewing--who at this time was not even a
     suspect in the November 5 incident--had violated the law.

1  to plaintiffs' § 1983 claim for the false arrest of Mark Ewing on

2  gun and drug charges.

3        D.    Arrest of Mark and Heather Ewing on Murder Charges

4        On November 8, five witnesses came to the SEB to

5  identify Mark and Heather Ewing.  After three were able to

6  unequivocally identify Heather Ewing as the female companion

7  during the November 5 incident, only one person gave a 50-60%

8  identification of Mark Ewing.  Later that afternoon, Reyes

9  discussed the status of the case with Deputy District Attorney

10 Fleming, and then Reyes add-booked murder charges against Mark

11 and Heather Ewing.  Fleming, who knew that the gun and drug

12 charges alone would render both suspects eligible for bail, told

13 Reyes that he was planning to file a criminal complaint charging

14 them with murder.  Therefore, under his belief that it would be

15 nonsensical to release them on bail only to subsequently

16 re-arrest them on the murder charges, Fleming instructed Reyes to

17 add-book the murder charges.  (Fleming Dep. 28:13-19.)

18     The officer defendants argue that, where Reyes simply

19 followed the instructions of Fleming, they must be absolved from

20 liability for the murder arrests.  However, despite the act of

21 consulting the district attorney's office prior to making a

22 murder arrest, the officer defendants have not disputed

23 contentions that Reyes retained absolute authority to make such

24 arrests.  (McCarthy Dep. 76:3-10).  Further, no evidence suggests

25 that they are required to follow the decisions of the district

26 attorney's office.

27       1.   Officer Defendants

28           a.    Heather Ewing

44

The officer defendants had probable cause to arrest Heather Ewing on murder charges.  By the time Reyes add-booked the murder charges against her, she had long been designated a suspect in the November 5 incident as a result of Shirk's extensive eyewitness testimony, a recent search of her home had turned up several weapon(s) (one being a Mag-Lite flashlight with possible blood and hair on it) and clothing that matched those reported at the scene, and--most significantly--three disinterested, reliable citizens had made unequivocal photo lineup identifications[25] of her as the female companion present

---

[25]     Reyes entered an incident report detailing the photo lineup identifications.  (Alonso Decl. Ex. A (Reyes Incident Report 16).)  Plaintiffs note that two of the witnesses that identified Heather Ewing stated, according to the incident report, that they saw Heather Ewing in the police station lobby before viewing the photo lineup.  Nonetheless, the court finds unavailing the argument that the eyewitness identification was constitutionally infirm.  First, the officer defendants have properly objected to this evidence as hearsay, and thus it may not be materially considered in the court's ruling.  See Colvin v. United States., 479 F.2d 998, 1003 (9th Cir. 1973) ("Entries in a police report based on an officer's observation and knowledge may be admitted, but statements attributed to other persons are clearly hearsay, and inadmissible.").

Further, assuming such evidence would be admissible, consideration of the sequential, two-part inquiry regarding witness reliability, Grant v. City of Long Beach, 315 F.3d 1081, 1086 (9th Cir.2002) ("(1) Did the officers employ an identification procedure so impermissibly suggestive as to give rise to a substantial likelihood of misidentification? And if so, (2) did the witnesses exhibit sufficient indicia of reliability to protect the integrity of their identifications?"), demonstrates that the two witnesses identifications pass muster.  Not only was their purported identification in the lobby spontaneous and unexpected, United States v. Stevens, 935 F.2d 1380, 1390-91 (3d Cir. 1991), but plaintiffs have presented no evidence of an impermissibly suggestive procedure, or, if such procedure existed, that it would not be cured by sufficient indicia of reliability (which in turn is able to protect the integrity the witness identifications).  Finally, one of the witnesses that plaintiffs refer to is Shirk, who had already identified photos of Heather Ewing as the female companion during the November 5 incident.

45

1  at Shakers' Bar that night.[26]  Under the "totality of

2  circumstances" analysis that guides probable cause

3  determinations, United States v. Smith, 790 F.2d 789, 792 (9th

4  Cir. 1986), this evidence was "trustworthy information sufficient

5  to lead a person of reasonable caution to believe an offense has

6  been or is being committed by the person being arrested." United

7  States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing Beck

8  v. Ohio, 379 U.S. 89, 91 (1964)).

9          While the charges against Heather Ewing were eventually

10  dropped, this does not disturb the initial finding of probable

11  cause to arrest her.  Pierson v. Ray, 386 U.S. 547, 555 (1967)

12  (the validity of an arrest does not depend upon an ultimate

13  finding of guilt or innocence).  Rather, the determination

14  whether there was probable cause is based upon the information

15  the officer had at the time of making the arrest.  See Devenpeck

16  v. Alford, 543 U.S. 146, 152 (2004) ("Whether probable cause

17  exists depends on the reasonable conclusion to be drawn from the

18  facts known to the arresting officer at the time of the arrest").

19  It is essential to avoid hindsight analysis--i.e., to consider

20  additional facts that became known only after the arrest was

21  made.  See Hansen v. Black, 885 F.2d 642, 645 (9th Cir. 1989)

22  (stating that the "reasonableness inquiry . . . is judged from

23  the perspective of a reasonable officer on the scene, rather than

24

25          [26]    Nor were the officer defendants obligated to follow up
   on Mark and Heather Ewing's purported alibis, which centered
26  around being "at home with our kids" during the disputed hours.
   (Heather Ewing Dep. 35:7-8.)  Once probable cause has been
27  established, police are neither required to "investigate
   independently every claim of innocence," nor compelled "by the
28  Constitution to perform an error-free investigation of such a
   claim."  Baker v. McCollan, 443 U.S. 137, 145-46 (1979).

with the 20/20 vision of 'hindsight'") (internal quotations and citations omitted).

Plaintiffs further contend that because Reyes told Fleming during their meeting that he had concerns regarding the amount of evidence necessary to charge Mark and Heather Ewing with murder, this presents a genuine issue of material fact that precludes summary judgment with respect to the arrest of Heather Ewing. This reasoning falters on two grounds. First, there is no genuine issue: Reyes has admitted that he expressed concerns related to charging "them"[27] with murder to Fleming during their meeting. Second, probable cause is an objective standard, and thus an officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes.[28] Lopez, 482 F.3d at 1072. The question is whether there is some objective evidence that, when presented to a reasonable officer, would

---

[27] It is not clear whether Reyes had reservations about add-booking the murder charges against Mark Ewing, Heather Ewing, or both. During his deposition, plaintiffs' counsel asked Reyes about his concerns related to bring murder charges against "them." (See Reyes Dep. 190:23-24 ("But did you believe that you had enough to charge them with murder?") (emphasis added).) Because the evidence placing Heather Ewing at the scene was fundamentally distinct and substantially stronger than the evidence placing Mark Ewing at the scene, it is reasonable to believe that Reyes possessed more concern related to add-booking the murder charges against Mark Ewing. Nonetheless, the objective reasonableness standard of the probable cause analysis renders this inquiry effectively moot.

[28] Indeed, a probable cause determination that weighs the subjective intent of officers related to the commission of an arrest could lead to conflicting conclusions among officers conducting identical arrests. For instance, both Hutto and Mayo testified in their respective depositions that probable cause indeed existed to add-book the murder charges against Heather Ewing (Hutto Dep. 265:11-12; Mayo Dep. 68:1-4, 80:17-18.)

allow the officer to deduce that a particular individual has committed or is in the process of committing a criminal offense. McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing Beck v. Ohio, 379 U.S. 89, 93-95 (1964)).

Because the aforementioned evidence would allow a reasonable officer to conclude that Heather Ewing played a substantial aiding and abetting role in the murder of Mark Donahue, such a standard is clearly met here.  Accordingly, the court will grant the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim for the false arrest of Heather Ewing on murder charges.

b.   Mark Ewing

In contrast, the court currently cannot find that the officer defendants clearly had probable cause to arrest Mark Ewing on murder charges.  While there was circumstantial evidence found inside the Ewing residence that could presumably link Mark Ewing to the November 5 incident (the flashlight, Jus' Brothers indicia, etc.), there was a considerable lack of direct evidence. Unlike Heather Ewing, no initial eyewitness testimony placed him at the scene.  Further, after the arrest on gun and drug charges, only one witness gave what could be described, at best, as a tentative identification of Mark Ewing as one of the Jus' Brothers members at the Shakers' Bar on November 5.  (Reyes Dep. 340:7-10 (described as a "50-60% ID")); see also Ramirez v. County of Los Angeles, 397 F. Supp. 2d 1208, 1223-24 (C.D. Cal. 2005) (finding that a single equivocal identification did not support defendant's claim that probable cause existed to arrest the § 1983 plaintiff).

48

1    Given this lack of direct evidence, the court is left

2 with the officer defendants' suspicions that Mark Ewing, as the

3 husband of Heather Ewing, was involved in the November 5

4 incident.  Standing alone, this is not enough to demonstrate

5 probable cause.  See McKenzie v. Lamb, 738 F.2d at 1008 (While

6 "[c]onclusive evidence of guilt is not necessary to establish

7 probable cause . . . [m]ere suspicion, common rumor, or even

8 strong reason to suspect are not enough") (citing Henry v. United

9 States, 361 U.S. 98, 101 (1959)).

10                    (1)  Qualified Immunity of Officer Defendants

11    The officer defendants assert that they are entitled to

12 qualified immunity with respect to the arrest of Mark Ewing

13 because the District Attorney instructed them to add-book the

14 murder charges, thereby absolving them of liability.  As relayed

15 in Section II.D. above, it is undisputed that the officer

16 defendants retained absolute authority to make the arrests.

17 However, a number of cases have approved the practice of an

18 officer consulting with the prosecutor before making an arrest.

19 See e.g., Kijonka v. Seitzinger, 363 F.3d 645, 648 (7th Cir.

20 2004); United States v. Merritt, 361 F.3d 1005, 1011-12 (7th Cir.

21 2004); Lavicky v. Burnett, 758 F.2d 468, 476 (10th Cir.1985)

22    The Ninth Circuit has held that, when instructed by a

23 prosecutor to make an arrest, "[i]t would be plainly unreasonable

24 to rule that the arresting officers . . . must take issue with

25 the considered judgment of an assistant United States Attorney

26 and the federal magistrate."  Arnsberg v. United States, 757 F.2d

27 971, 981 (9th Cir. 1984).  "Not only would such a rule cause an

28 undesirable delay in the execution of warrants, but it would also

49

mean that lay officers must at their own risk second-guess the
legal assessments of trained lawyers . . . .  The Constitution
does not require that allocation of law enforcement duties.  Id.
(citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).  Though
consulting a prosecutor may not give an officer absolute immunity
from being sued for false arrest, Womack v. City of Bellefontaine
Neighbors, 193 F.3d 1028, 1031 (8th Cir. 1999), it "goes far to
establish qualified immunity" because "[o]therwise the incentive
for officers to consult prosecutors--a valuable screen against
false arrest--would be greatly diminished."  Kijonka, 363 F.3d at
648.

        Here, it is undisputed that Fleming conveyed his intent
to file a criminal complaint against Mark Ewing and therein
instructed Reyes to arrest him on murder charges.  While such
action alone does not entitle the officer defendants to qualified
immunity, it admittedly carries great weight.  Id.  At the time
of the murder arrests, Reyes had no direct evidence placing Mark
Ewing at the crime scene other than a tentative identification.
However, he had circumstantial evidence including the seizure of
a large Mag-Lite flashlight from Mark Ewing's home that not only
matched the flashlight described in eyewitness statements but
also, according to the information Reyes had at the time,
appeared to be marked with blood and a strand of hair.

        Given the above legal precedent combined with the
circumstantial evidence, however slight, against Mark Ewing, the
court cannot find that a reasonable officer instructed by the
district attorney to make an arrest thereby knowingly violated
the law by making that arrest.  Gasho v. United States, 39 F.3d

1420, 1438 (9th Cir. 1994); cf. Burns v. Reed, 500 U.S. 478, 495
(1991) (qualified immunity is a generous standard designed to
protect "all but the plainly incompetent or those who knowingly
violate the law") (citation omitted).  Accordingly, the court
will grant the officer defendants motion for summary judgment
with respect to plaintiffs' § 1983 claim for the false arrest of
Mark Ewing on murder charges.

2.  <u>District Attorney Defendants</u>

A prosecutor is entitled to absolute immunity from a
civil action for damages when he or she performs a function that
is "intimately associated with the judicial phase of the criminal
process."  <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430 (1976).  At a
minimum, a prosecutor's functions that are protected by absolute
immunity include appearing at a probable cause hearing to support
an application for a search warrant, preparing and filing an
arrest warrant, initiating a prosecution, and presenting the
state's case.  <u>KRL v. Moore</u>, 384 F.3d 1105, 1110-11 (9th Cir.
2004).

a.  <u>Deputy District Attorney Fleming</u>

Two days after instructing Reyes to add-book the murder
charges, Fleming filed a criminal complaint charging Mark and
Heather Ewing with murder.  Plaintiffs concede that Fleming's
filing of the criminal complaint is protected by absolute
immunity, but contend that Fleming acted outside his role as a
judicial advocate by advising the police officers to arrest Mark

1  and Heather Ewing.[29]

2       Plaintiffs cite numerous cases to support their
3  contention that a prosecutor is not entitled to immunity for
4  advising police officers whether probable cause exists in
5  relation to their pretrial investigation.[30]  This notion is aimed
6  at removing absolute immunity from a prosecutor when he or she
7  functions as an administrator.  In other words, a prosecutor who
8  directs police officers in their investigative duties or assists
9  them in obtaining information or evidence in support of an arrest
10 or search warrant will be treated, for liability purposes, as a
11 police officer.  See Robichaud v. Ronan, 351 F.2d 533, 536 (9th
12 Cir. 1965) ("If he acts in the role of a policeman, then why
13 should he not be liable, as is the policeman.").

14      In Spivey v. Robertson, 197 F.3d 772 (5th Cir. 1999),
15 police officers visited the District Attorney's office to obtain
16 advice on whether the defendant could be held liable for making
17 copies of drivers' licenses that are then altered to make a minor
18 appear to be of the legal drinking age.  Id. at 773-74.
19 Following a review of the law, the Assistant District Attorneys

20
21      [29]  Because the court found that Heather Ewing's arrest on
   murder charges was supported by probable cause, the district
22 attorney defendants, if not entitled to either absolute or
   qualified immunity, would be liable only for the arrest of Mark
23 Ewing.

24      [30]  For example, courts have stripped prosecutors of
   absolute immunity when they fabricate evidence during preliminary
25 investigations and make false statements at press conferences,
   Buckley v. Fitzsimmons, 509 U.S. 259, 277-78 (1993), give legal
26 advice to police officers regarding the legality of their
   prospective investigative searches, Burns v. Reed, 500 U.S. 478,
27 495 (1991), engage in review and approval of investigatory search
   warrants, KRL, 384 F.3d at 1114, and advise undercover officers
28 to engage suspects in the crime of solicitation of a felony.
   Anderson v. Larson, 327 F.3d 762, 769 (8th Cir. 2003).

1  told the officers with what crimes the defendant could be charged

2  and instructed the officers to obtain an arrest warrant.  Id. at

3  774.  The district court denied the Assistant District Attorneys'

4  motion for summary judgment, finding that absolute prosecutorial

5  immunity did not apply because they were acting outside their

6  role as advocates.  Id.  On appeal, the Sixth Circuit reversed,

7  concluding that the district court erroneously considered

8  allegations that the Assistant District Attorneys had also

9  manufactured evidence, and thus the lower court's subsequent

10 decision to deny absolute immunity "turned entirely on th[is]

11 finding of manufactured evidence."  Id. at 776.

12        Absent the mistaken finding of "manufactured evidence,"

13 the Sixth Circuit held that the Assistant District Attorneys'

14 actions in advising the police officers on the state of the law

15 and instructing them to prepare an affidavit for an arrest

16 warrant were well within their role as advocates and thus

17 entitled them to absolute prosecutorial immunity.  Id.  The Sixth

18 Circuit summarized that

19        [t]he prosecutors were not creating or manufacturing new
          facts for the police officers to include in an affidavit
20        for an arrest warrant, but suggesting legal conclusions
          on the facts already given to them by the police.  Under
21        Kalina [v. Fletcher, 522 U.S. 118 (1997)], a prosecutor
          acts as an advocate in supplying legal advice to support
22        an affidavit for an arrest warrant and is entitled to
          absolute immunity as long as a prosecutor does not
23        personally attest to the truth of the evidence presented
          to a judicial officer, or exercise judgment going to the
24        truth or falsity of evidence.  Because the prosecutors
          were acting as advocates in supplying legal advice based
25        on facts provided by police officers to support an
          affidavit for an arrest warrant, the prosecutors in the
26        instant case are absolutely immune.

27 Spivey, 197 F.3d at 776.

28        Here, plaintiffs have likewise provided no evidence

                                  53

suggesting that Fleming assisted or advised the officer

defendants in support of their investigatory activities.  Fleming

was not involved in executing the search warrant, eliciting

witnesses for the lineups, gathering evidence, etc.  Rather,

Reyes merely briefed Fleming on the evidence to date, and Fleming

subsequently made a determination that, based on what he had

heard, probable cause existed to arrest Mark and Heather Ewing

for murder and subsequently file a criminal complaint.  See

Kalina, 522 U.S. at 129-30 (the determination of whether probable

cause exists to file charging documents is the function of an

advocate).

In light of his decision that probable cause existed to

file the criminal complaint, Fleming was also acting as an

advocate when he instructed Reyes to make the arrest.  Spivey,

197 F.3d at 776; see also Flavel v. Logsdon, 718 F. Supp. 836,

838 (D. Or. 1989) (prosecuting attorney has absolute immunity in

an action under 42 U.S.C. § 1983 where the alleged violation was

committed while advising a police officer not to arrest the

alleged trespasser because giving advice is prosecutorial

function); Orobono v. Koch, 30 F. Supp. 2d 843, 844 (E.D. Pa.

1988) (absolute prosecutorial immunity applies where the arrestee

brings a § 1983 claim alleging that the assistant district

attorney was moving force behind the arrestee's wrongful arrest,

even if the assistant district attorney gave the arresting

officer incorrect legal advice in demanding that the officer make

arrest the without a warrant).  Accordingly, the court will grant

defendant Fleming's motion for summary judgment with respect to

plaintiffs' § 1983 claim for the false arrest of Mark and Heather

54

1  Ewing on murder charges.

2            b.   District Attorney Phillips

3          Because the court has granted Fleming's request for

4  absolute immunity, it follows that Phillips likewise is absolved

5  of liability as his supervisor.[31]  See Jackson v. City of

6  Bremerton, 268 F.3d 646, 653 (9th Cir. 2001) (holding that a

7  supervisor is not liable if plaintiff did not actually suffer a

8  constitutional injury at the hands of his subordinate).

9  Accordingly, the court will grant defendant Phillips' motion for

10  summary judgment with respect to plaintiffs' § 1983 claim for the

11  false arrest of Mark and Heather Ewing on murder charges.

12      E.   The Continued Detention of Mark and Heather Ewing

13          Plaintiffs contend that even if the officer defendants

14  had probable cause to arrest Mark and Heather Ewing on the murder

15  charges, they nonetheless violated plaintiffs' constitutional

16  rights by keeping both of them in jail after they knew the true

17  identities of the participants in the November 5 incident.

18

19       [31]   The court notes that although plaintiffs' fourth cause
20  of action presents general allegations against Phillips in his
   role as District Attorney, supervisory liability is the only
21  theory under which these plaintiffs can state a claim against the
   District Attorneys for Fleming's actions.  Plaintiffs cannot
22  bring a Monell claim based on allegations that Fleming deprived
   plaintiffs of their constitutional rights pursuant to a policy or
23  custom of the District Attorney's Office.  See Monell v. Dep't of
   Soc. Servs. of N.Y., 436 U.S. 658, 694 (1978).  Such claims are
24  available only against local government entities, and the
   California District Attorneys represent the state, not their
25  local county, when performing investigative and prosecutorial
   functions.  See id. at 690 n.54 ("Our holding today is, of
26  course, limited to local government units . . . .");  Weiner v.
   San Diego County, 210 F.3d 1025, 1030-31 (9th Cir. 2000); Walker
27  v. County of Santa Clara, No. 04-02211, 2005 WL 2437037, at *4
   (N.D. Cal. Sept. 30, 2005) ("[A] district attorney also
28  represents the state when training and developing policies
   related to prosecuting violations of state law.").

Because plaintiffs have not alleged that the officer defendants acted maliciously or recklessly after Fleming filed the criminal complaint charging Mark and Heather Ewing with murder, any liability for plaintiffs' injuries necessarily ended at that time.  See Smiddy v. Varney, 665 F.2d 261, 267 (9th Cir.1981) ("[W]here police officers do not act maliciously or with reckless disregard for the rights of an arrested person, they are not liable for damages suffered by the arrested person after a district attorney files charges.").[32]  Therefore, plaintiffs can only recover on harms incurred from the time the true identities of the participants in the murder were determined until November 10.

     Between the initial detention of Mark and Heather Ewing on November 8 (Reyes arrested them on the gun and drug charges that morning and add-booked the murder charges later that day) and Fleming's filing of the criminal complaint, certain clues indicated that the officer defendants may have arrested the wrong people.  On November 9, a key witness returned to the SEB and identified Robert Memory in a photo line-up as one of the Jus' Brothers members involved in the November 5 incident.  The next morning, before Fleming filed his criminal complaint, Reyes and Hutto were informed of two anonymous calls telling the SPD that they had the wrong people, and that the actual responsible party was a man named "Frankie."  Given this information, plaintiffs

---

[32]     Plaintiffs do not allege any injuries that resulted from Mark and Heather Ewing's continued detention beyond November 10 because, like their decision whether to bring charges, prosecutors are absolutely immune for "fail[ure] to dismiss the charges after learning new information."  Morley v. Walker, 175 F.3d 756, 760 (9th Cir. 1999).

1    argue that the officer defendants had the names of the two men

2    involved and thus the continued detention of Mark and Heather

3    Ewing resulted in a constitutional liberty deprivation.[33]

4         Even if plaintiffs suffered a cognizable deprivation of

5    their liberty rights during this period of detention, the officer

6    defendants are nonetheless entitled to qualified immunity because

7    plaintiffs have not put forth facts sufficient to demonstrate

8    that the officer defendants knowingly violated the law by

9    continuing to detain Mark and Heather Ewing.  Gasho v. United

10   States, 39 F.3d 1420, 1438 (9th Cir. 1994).  Notably, once

11   probable cause has been established, the police are neither

12   required to "investigate independently every claim of innocence,"

13   nor compelled "by the Constitution to perform an error-free

14   investigation."  Baker v. McCollan, 443 U.S. 137, 145-46 (1979).

15        The witness identification of Robert Memory, occurring

16   just one day before the criminal complaint was filed, still left

17   two participants in the November 5 incident--a man and a woman.

18   As to the second man, the anonymous calls could hardly qualify as

19   exculpatory information.  There is no evidence that the calls--

20   which the defendant officers were made aware of just hours before

21   Fleming filed the criminal complaint--provided any actual leads

22   that may have expedited the discovery of the real participants

23

24

25

26

27        [33]   Outside of an instant confession by one of the new
     suspects identifying the female companion, it is unknown how this
28   information could plausibly be timely with respect to Heather
     Ewing.

other than the inclusion of the name "Frankie."[34]  Further, the officer defendants had a reasonable belief that the anonymous calls--suggesting that a man named "Frankie" was involved and may come forward--only occurred "because Mark Ewing was the vice president [of Jus' Brothers] and [members may be] trying to get him out of trouble."  (Hutto Dep. 304:2-6.)

Although Mark and Heather Ewing's prolonged detention was unfortunate, the court finds that the officer defendants are entitled to qualified immunity during the time of their initial detention until Fleming's filing of the criminal complaint. Accordingly, the court will grant the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim for continued detention of Mark and Heather Ewing.

F.   _Monell_ Liability: Defendant City of Stockton

A municipality may be held liable for a claim brought under § 1983 only "when execution of a municipality's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [a constitutional] injury."  Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 694 (1978).  A municipality "may not be held liable under a respondeat superior theory,"  Gibson v. County of Washoe, 290 F.3d 1175, 1185 (9th Cir. 2002) (citing Monell, 436 U.S. at

_____

[34]   Fleming prepared and filed the criminal complaint immediately after his meeting with Reyes and Hutton on November 10.  (Fleming Dep. 20-23.)  Later that day, Mayo mentioned to Reyes that the lawyer of a man named Frankie Prater contacted the SPD indicating that Prater was involved in the November 5 incident and wished to turn himself in. (Reyes Dep. 368:1-23.) Therefore, there are no facts showing that information solidifying the identity of Prater was presented to the officer defendants' until after the criminal complaint was filed.

694), and thus "rigorous standards of culpability and causation must be applied" to avoid holding a municipality liable for the actions of its employees.  <u>Bd. of the County Comm'rs v. Brown</u>, 520 U.S. 397, 405 (1997).

Because the court found above that two instances of the officer defendants' conduct--i.e., search or seizure related to the overbreadth portion of the search warrant and the arrest of Mark Ewing on gun and drug charges--may have resulted in constitutional violations, the scope of the § 1983 municipal liability inquiry is limited to those two actions.[35]  <u>See</u> <u>Dawson v. City of Seattle</u>, 435 F.3d 1054, 1065 (9th Cir. 2006) (holding that "[p]laintiffs cannot, as a matter of law, establish a valid § 1983 claim against King County" where the court had already found that the officers' search and seizure "did not deprive [p]laintiffs of any constitutional right") (citing <u>Flagg Bros., Inc. v. Brooks</u>, 436 U.S. 149, 155 (1978)).

---

[35]  In their opposition, plaintiffs limit their § 1983 municipal liability arguments to those related to the procurement of the search warrant and the subsequent arrests, thus apparently conceding a lack of municipal liability based on the SWAT Team's alleged violations of the "knock-and-announce" rule and "use of excessive force" during execution of the warrant.  Notably, the discovery process failed to provide a scintilla of evidence that the City of Stockton maintained a policy of inadequately training the SWAT Team.  Rather, the bulk of discovery evidence demonstrates that the SWAT Team engaged in extensive and comprehensive training.  (<u>See, e.g.</u>, Peppard Dep. 15:12-21 ("I went to a two-week basic SWAT school . . . and then they continuously train you after that . . . . We train as a Team once a month . . . I have been to multiple schools [per SWAT], close-quarter-battle school, rappelling school, schools like that to train you.").); <u>Merritt v County of Los Angeles</u>, 875 F.2d 765, 771 (9th Cir. 1989) (claim against county for excessive force would fail where arrestee did not present evidence indicating training program was inadequate; evidence to the contrary showed training was comprehensive, and any deficiency in officers' training did not amount to "deliberate indifference").

1    Plaintiffs allege that the City of Stockton, as a
2 matter of policy, has "failed to adequately train, supervise or
3 otherwise direct its police officers and employees . . .
4 concerning the rights of citizens."  (SAC ¶ 48.)[36]  Because the
5 City of Stockton cannot be found liable for the constitutional
6 injuries inflicted by its officers, it is entitled to summary
7 judgment unless the need for additional or different training is
8 "so obvious, and the inadequacy so likely to result in a
9 constitutional violation that the municipal policymakers can be
10 said to have been deliberately indifferent" to the inadequate
11 training.  Gibson, 290 F.3d at 1195 (quoting City of Canton v.
12 Harris, 489 U.S. 378, 388 (1989) ("Harris")).

13    Assuming, for summary judgment purposes, that the
14 officer defendants violated plaintiffs' Fourth Amendment rights
15 on November 8 by execution of the overbroad portion of the search
16 warrant, the court nonetheless concludes that plaintiffs have not
17 established municipal liability.  Where liability is premised on
18 a policy of inadequate training, "proof of a single incident of
19 unconstitutional activity is not sufficient to impose liability
20 under Monell, unless proof of the incident includes proof that it
21 was caused by an existing, unconstitutional municipal policy,
22 which policy can be attributed to a municipal policymaker."  City
23 of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).

24
25    [36]   In their Second Amended Complaint, plaintiffs also
allege § 1983 municipal liability based on the City of Stockton's
26 purported "fail[ure to] properly [] sanction or discipline police
officers and employees," (SAC ¶ 49), and "fail[ure] to use
adequate hiring procedures."  (Id. at ¶ 50.)  Because plaintiffs
27 have not submitted any evidence in support of either of these
contentions in their opposition to the instant motion, these are
28 hereby relinquished.

Plaintiffs have offered no actual evidence that the City of Stockton maintained a policy of providing inadequate training or was deliberately indifferent to such training.  Rather, plaintiffs request the court to infer such a policy based on selective parsing from unflattering portions of Reyes and Hutto's deposition testimony.

Conceding that Reyes has amassed a total of 1482.48 hours of documented training while with the SPD--including attendance at three separate conferences that dealt explicitly with obtaining search warrants--and received additional experience during his time at the police academy and while studying for several promotional examinations, plaintiffs nonetheless contend that Reyes' purported inability to understand the "probable cause" standard demonstrates the inadequacy of the City of Stockton's training policy.  Plaintiffs seemingly draw this conclusion from a contentious exchange during Reyes' deposition in which Reyes appeared reluctant and confused in regards to plaintiffs' counsel's proffered legal definition of "probable cause."

Rather than depicting a lack of understanding, however, Reyes clearly misinterpreted plaintiffs' counsel's definition as suggesting a standard of "guaranteed" assurance exceeding that of probable cause.  (See Reyes Dep. 174:16-18 (Reyes:  "[T]here's nothing guaranteeing that when you get a search warrant you're going to find what you're looking for"), 175: 15-18 (Reyes: "There is no guarantee when you get a search warrant that what you're going to go and find is there.  It may not be there.  It may have been destroyed or whatever.  It may have been moved.").)

Indeed, much of Reyes' deposition testimony evinces a clear, practical understanding of "probable cause," including affirmative statements that he would never seek a search warrant based "on a hunch" or "a mere possibility that maybe [he] might find some information that has to do with the crime [he's] investigating."[37]   (Reyes Dep. 183:15-25, 184:1-4.)

Likewise, plaintiffs contend that Hutto--who has received 2778.00 hours of documented training while with the SPD[38]--must also have been inadequately trained based on the fact that he included the overbroad portion when he composed the search warrant.  However, plaintiffs simultaneously concede that Hutto demonstrated exemplary understanding of the probable cause standard during his deposition, which he credited to SPD training that included his time at the police academy, subsequent promotional examinations, and the availability of legal reference books.  (Hutto Dep. 92:23-25, 93:1-6.)

With respect to Capps' purported improper arrest of

---

[37]   At best, plaintiffs simply demonstrate that Reyes may lack familiarity with the literal, hornbook definitions of legal terms.  That a defendant who is not a lawyer could not give perfect verbatim definitions of a legal term during deposition testimony does not mean that he was inadequately trained per municipal policy.  See Payne v. DeKalb County, 414 F. Supp. 2d 1158, 1181-82 (N.D. Ga. 2004) ("It cannot be said that county leaders would know to a 'moral certainty' that a failure to train police officers so that they can recite elements of various crimes by rote in depositions would lead to wrongful arrests and constitutional violations. Training officers to memorize [legal] definition[s] . . . cannot be said to rank in the same league as training them in the proper use of deadly force.  Thus, this failure to train, if indeed it is a failure, cannot be said to be 'deliberate indifference' to constitutional rights.").

[38]   The difference in training hours between Reyes and Hutto is the result of the latter's occasional involvement with the SWAT Team, a special assignment that requires he attend monthly mandatory training.

Mark Ewing on gun and drug charges, plaintiffs are equally unable to show that this stemmed from inadequate training.  Though no longer a defendant, plaintiffs never even attempted to ascertain Capps' training history despite the fact that they had deposed him.

Given only these conclusory arguments, the court cannot find that the City of Stockton's training program is inadequate. Even hypothetically assuming that plaintiffs could show the requisite inadequacy, liability would still only attach if "such inadequate training can justifiably be said to represent 'city policy.'"[39]  Harris, 489 U.S. 378, 390 (1989).  Notably absent are any patterns of tortious conduct at the hands of inadequately trained employees that may tend to demonstrate that the City of Stockton's policy or "deliberate indifference" to a lack of proper training was the "moving force" behind the plaintiffs' constitutional injuries.  Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 407-08 (1997) (citing Harris, 489 U.S. at 390-91). Rather, the injuries could presumably stem from a one-time negligent administration of the program or other factors peculiar to the officers involved in a particular incident.  Id. at 408. Plaintiffs are not allowed to attach municipal liability simply

---

[39]    Plaintiffs' sole citation in support of their municipal liability arguments is Edgerly v. City and County of San Francisco.  495 F.3d 645 (2007).  In Edgerly, the Ninth Circuit only attached municipal liability after discovery evidence revealed officers' testimony of specific instances in which they explicitly followed "department policy" per defendant City of San Francisco.  Id. at 659.  The policy erroneously instructed officers about the requirements for enforcing a statute, leading them to commit several constitutional violations.  Id. In the instant matter, plaintiffs have failed to identify a City of Stockton policy associated with their alleged injuries, or that any of the officers involved followed such a policy.

1   by contending that their purported injury could have been avoided

2   if Reyes and/or Hutto had better or more training because,

3   "plainly, adequately trained officers occasionally make mistakes;

4   the fact that they do says little about the training program or

5   the legal basis for holding the city liable."  Harris, 489 U.S.

6   at 391.

7          Based on the limited evidence that plaintiffs bring

8   before the court, it cannot be said that the SPD, "in exercising

9   [its] discretion, so often violate constitutional rights that the

10  need for further training [was] plainly obvious to the city

11  policymakers, who, nevertheless, [were] 'deliberately

12  indifferent' to the need."  Id. at 390 n.10; see also Merritt v.

13  County of Los Angeles, 875 F.2d 765, 771 (9th Cir. 1989)

14  ("[T]here is simply no evidence from which a jury could

15  reasonably infer that this deficiency amounted to 'deliberate

16  indifference' on the part of the County.").  Indeed, permitting

17  cases against municipalities for their purported "failure to

18  train" police officers to go forward under § 1983 without a

19  requisite "deliberate indifference" showing would result in de

20  facto respondeat superior liability.  Cf. Harris, 489 U.S. at 392

21  (allowing municipal liability for "failure to train" cases absent

22  the "deliberate indifference" standard "would also engage the

23  federal courts in an endless exercise of second-guessing

24  municipal employee-training programs [and] [t]his is an exercise

25  we believe the federal courts are ill suited to undertake, as

26  well as one that would implicate serious questions of

27  federalism").

28          Accordingly, the court will grant defendant City of

1  Stockton's motion for summary judgment with respect to
2  plaintiffs' § 1983 Fourth Amendment claims.

3      F.   State Law Claims

4          Plaintiffs also bring corresponding state law claims of
5  negligence and negligent supervision against defendants based on
6  the allegations described above.

7          1.   Negligence (Against All Defendants)

8               a.   Officer Defendants

9          Because summary judgment is appropriate on the bulk of
10  plaintiffs' Fourth Amendment claims against the officer
11  defendants, summary judgment is likewise appropriate on the
12  majority of plaintiffs' negligence claim against them for many of
13  the same reasons.  Namely, the court found that the procurement
14  of the search warrant was based on probable cause and that the
15  officer defendants primarily conducted themselves as an
16  objectively reasonable officer would have under similar
17  circumstances.  See Benun v. Superior Court, 123 Cal. App. 4th
18  113, 122 (2004) ("[N]egligence is the failure to exercise the
19  care a person of ordinary prudence would exercise under the
20  circumstances.").  To the extent that the court has recognized a
21  possible deviation from the standard of reasonable care--i.e.,
22  with respect to (1) the inclusion of the erroneous criminal
23  history of Heather Ewing in the search warrant, (2) the seemingly
24  overbroad portions of the warrant, and (3) the possible false
25  arrest of Mark Ewing on gun and drug charges--the officer
26  defendants contend that California Government Code sections 820.2
27  and 821.6 provide them with immunity from plaintiffs' negligence
28  claim.  Cal. Gov't Code §§ 820.2, 821.6.

65

1        Section 821.6 provides that "[a] public employee is not

2   liable for injury caused by his instituting or prosecuting any

3   judicial or administrative proceeding within the scope of his

4   employment, even if he acts maliciously and without probable

5   cause."  Id. § 821.6.  Although section 821.6 is principally used

6   to immunize defendants from malicious prosecution claims, it is

7   not limited to that use.  Jenkins v. County of Orange, 212 Cal.

8   App. 3d 278, 283 (1989).  Indeed, immunity under section 821.6

9   specifically applies to allegations of negligence.  Parkes v.

10  County of San Diego, 345 F. Supp. 2d 1071, 1082 (S.D. Cal. 2004)

11  (citing Jenkins, 212 Cal. App. 3d at 286 (1989)).  Moreover,

12  immunity under section 821.6 is not limited to conduct during

13  formal proceedings; rather, the statute also "'extends to actions

14  taken in preparation for formal proceedings,' including actions

15  'incidental to the investigation of crimes'" because an

16  investigation is an essential step in initiating such

17  proceedings.  Blankenhorn v. City of Orange, 485 F.3d 463, 488

18  (9th Cir. 2007) (quoting Amylou R. v. County of Riverside, 28

19  Cal. App. 4th 1205, 1210-11 (1994)); see also Amylou, 28 Cal.

20  App. 4th at 1210 ("Since the acts of which [plaintiff] complains

21  are incidental to the investigation of the crimes, and since

22  investigation is part of the prosecution of a judicial

23  proceeding, those acts were committed in the course of the

24  prosecution of that proceeding.").

25        Here, the facts above demonstrate that the officer

26  defendants' inclusion of Heather Ewing's erroneous criminal

27  history and the two overbroad categories of items in the search

28  warrant occurred during the investigatory stage of the November 5

66

incident.   As a result, the officer defendants are entitled to
immunity under section 821.6, even if this alleged tortious
conduct was caused maliciously or in the absence of probable
cause.   See Javor v. Taggart, 98 Cal. App. 4th 795, 808-09 (2002)
(law enforcement officers are granted immunity from civil
liability under the provisions of section 821.6 when the
malicious abuse of their power is confined to actions taken
during the investigatory stages).   While conceding that section
821.6 provides immunity to officers who conduct erroneous
investigations may at times result in injustices, "California
courts . . . have accepted such a consequence."   Trujillo v. City
of Ontario, 428 F. Supp. 2d 1094, 1124-25 (C.D. Cal. 2006)
("'[I]n the end [it is] better to leave unredressed the wrongs
done by dishonest officers than to subject those who try to do
their duty to the constant dread of retaliation.'" (quoting
Amylou, 28 Cal. App. 4th at 1213)).

        The officer defendants also argue that they are immune
from liability with respect to the arrest of Mark Ewing on gun
and drug charges because plaintiffs' alleged injury derives
solely from the discretionary decision to arrest him.   Under
section 820.2, "a public employee is not liable for an injury
resulting from his act or omission where the act or omission was
the result of the exercise of discretion vested in him, whether
or not such discretion be abused."   Cal. Gov't Code section
820.2.   To determine which acts are discretionary, California
courts do not look at the literal meaning of "discretionary"
because "[a]lmost all acts involve some choice between
alternatives."   Caldwell v. Montoya, 10 Cal. 4th 972, 981 (1995).

Rather, immunity protects "basic policy decisions," but does not protect "operational" or "ministerial" decisions that merely implement a basic policy decision.  <u>Johnson v. State</u>, 69 Cal. 2d 782, 796 (1968).  Thus, there is no immunity "if the injury . . . results, not from the employee's exercise of discretion vested in him to undertake the act, but from his negligence in performing it <u>after</u> having made the discretionary decision to do so." <u>McCorkle v. City of Los Angeles</u>, 70 Cal. 2d 252, 261 (1969) (emphasis added) (internal quotation and citation omitted).

Plaintiffs fail to articulate their alleged injury as anything beyond the scope of the officer defendants' purported decision to arrest Mark Ewing (<u>See</u> SAC ¶ 59 (alleging only that "[Mark Ewing] was arrested and taken to the station house in the back of a squad car").)  Notably absent are any allegations of negligent conduct or malfeasance that may have occurred during the execution or performance of the arrest.  Because the exercise of discretion and plaintiffs' alleged injury are not only linked by a causal connection, but rather are one in the same, section 820.2 effectively immunizes the officer defendants from liability with respect to their decision to arrest Mark Ewing on gun and drug charges.[40]  <u>McCorkle</u>, 70 Cal. 2d at 262 (only because "the

---

[40]    California Government Code section 820.4 provides that "[a] public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  Cal. Gov't Code § 820.4.  While upholding section 820.2's immunity with respect to a public employees' discretionary decisions, section 820.4 simply codifies the notion that public employees nonetheless remain liable for acts, tactics, or conduct related to a plaintiff's specific claims of false arrest and false imprisonment.  <u>See</u> <u>Bell v. State</u>, 63 Cal. App. 4th 919, 929

1  essential requirement of section 820.2--a causal connection

2  between the exercise of discretion and the injury--did not exist,

3  the statutory immunity does not apply"); see also Blankenhorn v.

4  City of Orange, 485 F.3d 463, 487 (9th Cir. 2007) ("[Section

5  820.2] applies to police officers' discretionary decisions made

6  during arrests.") (citations omitted); Martinez v. City of Los

7  Angeles, 141 F.3d 1373, 1379 (9th Cir. 1998) (noting that while

8  section 820.2 immunizes the discretionary decision to arrest, it

9  does not apply where "[plaintiff's] allegations go beyond the

10  contention that the LAPD officers acted improperly in deciding to

11  seek his arrest"); McCarthy v. Frost, 33 Cal. App. 3d 872, 875

12  (1973) (under section 820.2, "[a] decision to arrest, or to take

13  some protective action less drastic than arrest, is an exercise

14  of discretion for which a peace officer may not be held liable in

15  tort").

16        Accordingly, because sections 820.2 and 821.6 immunize

17  the officer defendants' alleged injurious conduct, the court will

18  grant their motion for summary judgment with respect to

19  plaintiffs' claim of negligence.

20              b.   Defendant City of Stockton

21        Unlike the rule limiting municipal liability under

22

23  (1998) (because state defendants failed to present sufficient
    evidence that they exercised the requisite level of discretion to
24  qualify for section 820.2, they remained potentially liable under
    section 820.4 regarding their non-discretionary tactics and
25  conduct related to plaintiff's false arrest claim).  In the
    instant matter, section 820.4 is inapplicable because plaintiffs
26  do not allege injury-inducing conduct aside from the officer
    defendants' exercise of discretion to arrest Mark Ewing.
27  Moreover, plaintiffs fail to allege a specific claim of either
    false arrest or false imprisonment that must form the basis to
28  pierce section 820.4 immunity.

1   federal law set out in <u>Monell v. Dep't of Soc. Servs. of N.Y.</u>,

2   436 U.S. 658, 694 (1978), California law imposes liability on

3   municipalities under the doctrine of respondeat superior.  Cal.

4   Gov't Code § 815.2(a) ("A public entity is liable for injury

5   proximately caused by an act or omission of an employee of the

6   public entity within the scope of his employment if the act or

7   omission would . . . have given rise to a cause of action against

8   that employee or his personal representative."); <u>Robinson v.</u>

9   <u>Solano County</u>, 278 F.3d 1007, 1016 (9th Cir. 2002).  However, "a

10  public entity is <u>not</u> liable for an injury resulting from an act

11  or omission of an employee of the public entity where the

12  employee is immune from liability."  Cal. Gov't Code § 815.2(b)

13  (emphasis added).

14      Because sections 820.2 and 821.6 immunize the officer

15  defendants from liability with respect to plaintiffs' negligence

16  claim, the City of Stockton is also immune from this claim.

17  <u>Robinson</u>, 278 F.3d at 1016; <u>see also</u> <u>Kemmerer v. County of Fresno</u>

18  200 Cal. App. 3d 1426, 1435 (1988) ("Though sections 821.6 and

19  820.2 expressly immunize only the employee, if the employee is

20  immune, so too is the [public entity].").

21      The City of Stockton also argues that its immunity

22  extends to the purported injuries suffered during the search of

23  the Ewing residence.  For the reasons provided in the court's

24  analysis of plaintiffs' § 1983 claims related to the SWAT Team's

25  alleged "knock-and-announce" violation and use of excessive

26

27

28

force,[41] plaintiffs have raised a triable issue as to whether the

SWAT Team, while operating in the course of their employment as

members of the SPD, committed these violations during execution

of the search warrant.  While section 821.6 has previously been

held to immunize investigating officers from liability for

injuries inflicted during the execution of a search warrant, see

Baughman v. State, 38 Cal. App. 4th 182, 192-93 (1995) (during

execution of the search warrant, "the officers' actions . . .

were cloaked with immunity [under section 821.6], even if they

had acted negligently, maliciously or without probable cause in

carrying out their duties") (internal citations omitted), the

current evidence does not support a finding that the SWAT

Team--and thereby the City of Stockton--are immune from liability

for injuries that may have arose during the service of the

warrant.[42]

---

  [41]  Where a plaintiff's injuries are allegedly caused by an
officer's use of excessive force, section 820.2 cannot grant the
officer immunity from suit because engaging in such conduct is
inherently distinct from the discretionary decision to, for
example, make an arrest.  See, e.g., Larson v. City of Oakland,
17 Cal. App. 3d 91, 95-98 (1971); Scruggs v. Haynes, 252 Cal.
App. 2d 256, 262-68 (1967); Ne Casek v. City of Los Angeles, 233
Cal. App. 2d 131, 136-38 (1965).  However, this determination
alone does not negate the relevance of a section 821.6 immunity
inquiry for any action "incidental to the investigation of
crimes."  Blankenhorn v. City of Orange, 485 F.3d 463, 488 (9th
Cir. 2007) (quoting Amylou R. v. County of Riverside, 28 Cal.
App. 4th 1205, 1210-11 (1994)).

  [42]  Although California Government Code section 821.8
specifically addresses liability for damages "arising out of [an]
entry upon [] property" and does not "exonerate[] a public
employee from liability for an injury proximately caused by his
own negligent or wrongful act or omission," Cal. Gov't Code §
821.8, it also does not supersede the inquiry into application of
section 821.6 immunity with respect to the instant claim.
Rather, section 821.8 frequently serves as the basis for recovery
of property damages linked to a public employee's entry upon

1    Although California courts recognize that the policy

2  underlying section 821.6 immunity is to encourage state officers

3  to "investigate and prosecute matters within their purview

4  without fear of reprisal by the person or entity harmed thereby,"

5  Shoemaker v. Myers, 2 Cal. App. 4th 1407, 1424 (1992), they have

6  also held that "it is doubtful that this provision extends to

7  acts performed by individuals who are not themselves conducting

8  an investigation but are merely collecting evidence for those who

9  are investigating." Burdett v. Reynoso, No. 06-0720, 2007 WL

10  2429426, at *27 (N.D. Cal. Aug. 23, 2007) (emphasis in original).

11  The City of Stockton has produced no evidence that the SWAT Team

12  had any investigatory role in the instant matter.  Rather, it

13  appears their actions were confined to a twenty-four minute

14  period in which they secured the Ewing residence for the actual

15  investigating members of the SPD.  Moreover, even if section

16  821.6 did apply to the SWAT Team, it likely would not extend to

17  any state law claims functioning as counterparts to a § 1983

18  excessive force claim.  Herve v. City & County of San Francisco,

19  No. 03-4699, 2004 WL 2806165, at *7 (N.D. Cal. Dec. 7, 2004)

20  (citing Scruggs v. Haynes, 252 Cal. App. 2d 256, 267-68 (1967));

21  Duffy v. S.F. Police Dep't, No. 02-2250, 2005 WL 474856, at *3

22  (N.D. Cal. Feb. 25, 2005).

23    Thus, when viewing the evidence in the light most

24  favorable to the non-moving party, the court cannot conclude that

25  the SWAT Team was performing an investigatory role in serving the

26

27  property.  See, e.g., Bettencourt v. State, 51 Cal. App. 3d 892,
28  894 (1975) (section 821.8 applies where officers cut open a fence
   upon entering the property causing harm to cattle).

1  search warrant at the Ewing residence.  See Marsh v. San Diego

2  County, 432 F. Supp. 2d 1035, 1057 (S.D. Cal. 2006) (holding that

3  section 821.6 did not apply to medical personnel and coroner who

4  provided information for investigator and prosecutor because

5  these individuals were not actually investigating or prosecuting

6  the case).  Because California law dictates that a city's

7  immunity depends upon whether its employees are immune, Robinson,

8  278 F.3d at 1016, the City of Stockton may indeed be held liable

9  for the SWAT Team's alleged injurious conduct.

10        Accordingly, the court will grant defendant City of

11  Stockton's motion for summary adjudication with respect to

12  plaintiffs' claim of negligence.  As a matter of law, the City of

13  Stockton is not liable for the actions of the officer defendants

14  taken pursuant to their investigation of the instant matter.  In

15  turn, the court will deny the City of Stockton's motion for

16  summary adjudication with respect to plaintiffs' claim of

17  negligence as it relates to the SWAT Team's alleged

18  "knock-and-announce" violation and use of excessive force during

19  execution of the search warrant.

20              c.  District Attorney Defendants

21        The statutory immunity identified in section 821.6 also

22  shields Fleming and Phillips from liability for injury caused by

23  instituting or prosecuting a judicial proceeding within scope of

24  their employment, even if undertaken maliciously and without

25  probable cause.  Cal. Gov't Code § 821.6; Parkes v. County of San

26  Diego, 345 F. Supp. 2d 1071, 1082 (S.D. Cal. 2004).  As mentioned

27  above, this immunity specifically applies to allegations of

28  negligence.  Id. (citing Jenkins v. County of Orange, 212 Cal.

App. 3d 278, 286 (1989)).  Accordingly, the court will grant
defendants Fleming and Phillips' motion for summary judgment with
respect to plaintiffs' claim of negligence.

      2.   Negligent Supervision (Against Defendants City of
Stockton and Phillips)

      a.   Defendant City of Stockton

     In Eastburn v. Reg'l Fire Prot. Auth., 31 Cal. 4th 1175
(2003), the California Supreme Court recently held that public
entities in California are immune from direct common law claims
of negligence under the California Tort Claims Act unless there
is a statutory basis for the negligence claim.  Id. at 1183-85
("'A public entity is not liable for an injury,' '[e]xcept as
otherwise provided by statute.'" (quoting Cal. Gov't Code §
815(a)));  see also id. ("[D]irect tort liability of public
entities must be based on a specific statute declaring them to be
liable, or at least creating some specific duty of care, and not
on [] general tort provisions . . . [o]therwise, the general rule
of immunity for public entities would be largely eroded by the
routine application of general tort principles.").

     Here, plaintiffs allege that defendant City of Stockton
was negligent in managing, supervising, and/or controlling the
conduct of its officer employees in order to prevent the alleged
wrongs pertaining in the instant action.  (SAC ¶ 61.)  However,
plaintiffs have failed to identify a state statutory basis for
this claim.  See Sorgen v. City & County of San Francisco, No.
05-3172, 2006 WL 2583683, at *10 (N.D. Cal 2006) (granting
summary judgment where plaintiff failed to identify a statutory
basis for his assertion that the City of San Francisco was

1  negligent in hiring, training, supervising and/or disciplining

2  its employee); <u>Munoz v. City of Union City</u>, 120 Cal. App. 4th

3  1077, 1112-15 (2004) (finding that the defendant city was immune

4  from a direct claim that it had negligently trained, supervised,

5  and disciplined police officers involved in a shooting because

6  the plaintiffs could not identify a statutory basis for the claim

7  or a statute creating a specific duty of care).  Accordingly, the

8  court will grant the City of Stockton's motion for summary

9  judgment with respect to plaintiffs' claim of negligent

10 supervision.

11                b.   <u>District Attorney Phillips</u>

12         Plaintiffs also allege that defendant Phillips was

13 negligent in managing, supervising, and/or controlling the

14 purported conduct of Deputy District Attorney Fleming.  A

15 supervisor is liable for negligent supervision under California

16 law only if he has knowledge that the individual allegedly not

17 supervised properly "was a person who could not be trusted to act

18 properly without being supervised." <u>Noble v. Sears, Roebuck &</u>

19 <u>Co.</u>, 33 Cal. App. 3d 654, 664 (1973).

20         Plaintiffs fail to provide evidence that Phillips knew

21 or should have known that Fleming would engage in the alleged

22 misconduct, which this court nonetheless found to be effectively

23 harbored within section 821.6's prosecutorial immunity provision.

24 Nor have plaintiffs presented evidence that Phillips had

25 knowledge that Fleming could not be trusted to act properly.  <u>See</u>

26 <u>Baker v. State of California</u>, No. 05-589, 2007 WL 512425, at *2-3

27 (E.D. Cal. Feb. 12, 2007) (denying federal and state law claims

28 of negligent supervision against supervisors where plaintiff

                                75

failed to provide evidence that the supervisor "knew or should have known" of the alleged illicit action of his employees). Accordingly, the court will grant Phillips' motion for summary judgment with respect to plaintiffs' claim of negligent supervision.

IT IS THEREFORE ORDERED that:

(1) the officer defendants' motion for summary adjudication with respect to plaintiffs' § 1983 claim for procurement of an invalid search warrant be, and the same hereby is, GRANTED insofar as it relates to that part of the search and seizure conducted pursuant to paragraphs 1, 2, 3, 4, and 6 of the search warrant;

(2) the officer defendants' motion for summary adjudication with respect to plaintiffs' § 1983 claim for procurement of an invalid search warrant be, and the same hereby is, DENIED insofar as it relates to that part of the search and seizure conducted pursuant to paragraphs 5 and 7 of the search warrant;

(3) the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim that the officer defendants violated the knock-and-announce rule be, and the same hereby is, GRANTED;

(4) the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim that the officer defendants used excessive force during execution of the search warrant be, and the same hereby is, GRANTED;

(5) the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim for the false arrest of

Heather Ewing on gun and drug charges be, and the same hereby is, GRANTED;

(6) the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim for the false arrest of Mark Ewing on gun and drug charges be, and the same hereby is, DENIED;

(7) the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim for the false arrest of Heather Ewing on murder charges be, and the same hereby is, GRANTED;

(8) the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim for the false arrest of Mark Ewing on murder charges be, and the same hereby is, GRANTED;

(9) defendants Fleming and Phillips' motion for summary judgment with respect to plaintiffs' § 1983 claim for the false arrest of Heather Ewing on murder charges be, and the same hereby is, GRANTED;

(10) defendants Fleming and Phillips' motion for summary judgment with respect to plaintiffs' § 1983 claim for the false arrest of Mark Ewing on murder charges be, and the same hereby is, GRANTED;

(11) the officer defendants' motion for summary judgment with respect to plaintiffs' § 1983 claim for the continued detention of Mark and Heather Ewing be, and the same hereby is, GRANTED;

(12) defendant City of Stockton's motion for summary judgment with respect to plaintiffs' § 1983 Fourth Amendment claims be, and the same hereby is, GRANTED;

77

1   (13) the officer defendants' motion for summary

2 judgment with respect to plaintiffs' claim of negligence be, and

3 the same hereby is, GRANTED;

4   (14) defendant City of Stockton's motion for summary

5 adjudication with respect to plaintiffs' claim of negligence be,

6 and the same hereby is, GRANTED insofar as it relates to the

7 actions of the officer defendants;

8   (15) defendant City of Stockton's motion for summary

9 adjudication with respect to plaintiffs' claim of negligence be,

10 and the same hereby is, DENIED insofar as it relates to the

11 actions of the SPD SWAT Team;

12   (16) defendants Fleming and Phillips' motion for

13 summary judgment with respect to plaintiffs' claim of negligence

14 be, and the same hereby is, GRANTED;

15   (17) defendant City of Stockton's motion for summary

16 judgment with respect to plaintiffs' claim of negligent

17 supervision be, and the same hereby is, GRANTED; and

18   (18) defendant Phillips motion for summary judgment

19 with respect to plaintiffs' claim of negligent supervision be,

20 and the same hereby is, GRANTED.

21 DATED:  February 7, 2008

22

23 _____

24 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

25

26

27

28

78